# STATE v BILLIE
## Case No. 83-202
Twentieth Judicial Circuit, Hendry County

June 28, 1985

### APPEARANCES OF COUNSEL

**Robert Greene,** Assistant State Attorney, Hendry County, for plaintiff.

**Lee Hollander,** Assistant State Attorney, Collier County, for plaintiff.

**Michael L. Kobiolka** for defendant, James Billie.

**Jim Shore** for defendant, James Billie.

**Patrick Garaghty** for defendant, James Billie.

### OPINION OF THE COURT

HUGH D. HAYES, Circuit Judge.

The Defendant, JAMES BILLIE, has filed his Motion to Dismiss the Information in this cause on the basis of two defenses: (1) The Treaty Defense, and (2) The Civil/Regulatory v. Criminal/Prohibitory Defense.

## THE MOTION TO DISMISS IS GRANTED AS TO EACH DEFENSE

### I. GENERAL FACTS OF CASE

James Billie is an enrolled member and an Indian chief or chairman of the Seminole Tribe of Florida, a duly recognized Indian tribe organized and existing under the laws of the United States, Section 16 of the Act of June 18, 1934 (48 Stat. 984) as amended by the Act of June 15, 1935 (49 Stat. 378), and Executive Order No. 1379, signed 28 June 1911 by President William H. Taft.

The facts are undisputed that the Defendant is a full blooded Seminole Indian who was arrested on the basis of an anonymous tip for a violation of F. S. 372.671, relating to the hunting and killing of an alleged Florida panther, which panther was on the Seminole tribal reservation.

### II. THE TREATY DEFENSE

#### A. HISTORICAL PERSPECTIVE (PRE PUBLIC LAW 280)

Historically, as early as 1775 the United States Congress had recognized Indians as "nations" or "tribes". (See Journals 30th June and 12th July 1775; 8th March 1776 and 20th October 1777). When dealing with the Indians in their aggregate capacity as nations they were treated as sovereign and independent, and not within the jurisdiction nor under the government of the states within which they were located. The negotiations carried on with the Indian nations had been by way of treaty with all the formality attending the making of treaties with any foreign power. Recognizing that the condition of the Indians in relation to the United States was unlike that of any other two peoples in existence and that this was a relationship marked by peculiar and cardinal distinctions which existed no where else, Chief Justice Marshall, in delivering the opinion of the Court during the January Term 1831 in the case of *The Cherokee Nation v. The State of Georgia*, stated at page 15:

. . . . A people once numerous, powerful, and truly independent, found by our ancestors in the quiet and uncontrolled possession of an ample domain, gradually sinking beneath our superior policy, our arts and our arms, have yielded their lands by successive treaties, each of which contains a solemn guarantee of the residue, until they retain no more of their formerly extensive territory than is deemed necessary to their comfortable subsistence. To preserve this remnant, the present application is made.

In the Treaty of Hopewell, 28 November 1785, 1 Laws U.S. 322, the

United States Government began recognizing the boundaries of the Indian reservations as being also allotted as hunting grounds (Article 4) and likewise forbade any citizen of the United States to hunt on the Indian lands or to enter their country without a passport (Article 9).

The Supreme Court continued in *Samuel A. Worcester v. State of Georgia*, January Term 1832, to consider the several Indian nations as distinct political communities, having territorial boundaries, within which their authority was exclusive, which authority was not only acknowledged, but guaranteed by the United States.

The Seminole Indians of Florida retained their exclusive rights to hunting in Article I and VII of the Treaty With Creeks, 1790; Article IV of the Treaty with The Florida Tribes of Indians, 1823; Executive Order No. 1397, signed 28 June 1911 by William H. Taft; Section 16 of the Act of June 18, 1934 (48 Stat. 984) as amended by the Act of June 15, 1935 (49 Stat. 378); and the Constitution and By-Laws of the Seminole Tribe of Florida as approved and accepted by the Commissioner of Indian Affairs and the Secretary of the Interior in Washington, D.C. on July 11, 1957.

In 1940, the very Seminole Indian reservation involved in the case at bar today was the subject of an issue between the then Florida State Commission of Game and Freshwater Fish and the Seminole Indian Reservation of Hendry County, Florida. The issue concerned whether the state game commission could enforce Special Acts 1939, pursuant to Chapter 19860, Laws of Florida, the removal of tick infested wild deer from Hendry County, to include the Seminole Indian Reservation. The Acting Solicitor, in his opinion #M-30920, dated 4 September 1940 to Secretary of the Interior, took the position that the State law could be described as both a quarantine and a game law adopted under the police power of the State and enforced by criminal sanctions. As a game law, the Solicitor found that the protection and the guarantee by the United States of hunting and fishing rights had been typically one of the cardinal provisions of treaties with the Seminole Indians, citing the treaties of August, 1790 (7 Stat. 35), and 18 September, 1823 (7 Stat. 224). Likewise, the Department of Interior had found that:

.... Hunting is recognized to be the chief means of livelihood of the Seminole Indians in Florida, both as a source of food and as a means of commerce with the surrounding population. Moreover, the chief utility of the Indian reservation in Hendry County has been demonstrated t be *as a hunting reserve for the Indians* (emphasis added). M-30920 at page 376.

Thus, the Solicitor took the position that based upon the Depart-

ment's own studies and citing *Worcester v. Georgia*, 6 Pet. 515 (1832), that without Congressional sanction, the State laws had no effect or force on Indian reservations in matters affecting Indians, and secondly, that the State of Florida could not send officers on an Indian reservation to search for game thought to be possessed by Indians nor could the State enforce its game laws specifically against the Indians on Indian reservations, citing *In re Blackbird*, 109 F. 139 (D.C. Wis. 1901), *In re Lincoln*, 129 Fed. 247 (W. D. Calif. 1904), and *U. S. v. Hamilton*, 233 Fed. 685 (W.D.N.Y. 1915).

## II. TREATY DEFENSE

### B. PUBLIC LAW 280 ANALYSIS

Even though a basically fertile legal ground existed in the area of state law v. Indians rights, it was generally the position and direction of the federal courts (where the Indian nations have received their strongest protection of rights) that statutes passed for the benefit of dependent Indian tribes were to be liberally construed, with doubtful expressions being resolved in favor of the Indians. The basic reasoning for this position was that the Indians stood in a special relation to the federal government from which the states were excluded unless Congress manifested a clear purpose to terminate the Indians' immunity and to allow the states to treat the Indians as part of the general community. *Alaska Pacific Fisheries v. U.S.*, 248 US 78, 63 L. Ed 138, 39 S. Ct. 40 (1918); *Choate v. Trapp*, 224 US 665, 56 L.Ed 941, 32 S. Ct. 565 (1912); and *Oklahoma Tax Commission v. U.S.*, 319 US 598, 87 L. Ed 1612, 63 S. Ct. 1284 (1943).

With the passage by Congress in 1953 of Public Law 280, some confusion over the federal pre-emption theory began to rise. An analysis of Pub. L. No. 280 and its federal case law is necessary to reach a Florida conclusion.

Public Law 280 and its relevant subparts: Act of August 15, 1953, 67 Stat. 588, codified at 18 U.S.C. Sec. 1162 (criminal) and 28 U.S.C. Sec. 1360 (civil) as amended by the Act of April 11, 1968, 82 Stat. 78, codified at 25 U.S.C. Sec. 1321 (criminal) and the act of April 11, 1968, 82 Stat. 79, codified at 25 U.S.C. Sec. 1322, was an expression of Congressional authority which allowed the states to lawfully assert some limited forms of criminal and civil jurisdiction over Indians in Indian country. In some of the states (Alaska, California, Minnesota, Nebraska, Oregon and Wisconsin) assumption of jurisdiction was mandatory, whereas, for most of the other states, there was an option to assume jurisdiction. (Florida assumed such jurisdiction pursuant to the option in 1961 pursuant to F. S. 285.16). The interpretation of the

71

degree, extent and explicit application of these states' laws has caused confusion, not to mention that such mandatory authority was amended in the criminal area in 1968, and such states authority can now only be acquired with the consent of the appropriate Indian tribe. (Pub. L. No. 90-284, Title IV, Sec. 401).

The confusion arose over what has been referred to as the "savings clause" and the extent of its application on the 1953 federal statute as well as its successor 1968 amendment. 28 U.S.C. Sec. 1360(b); 18 U.S.C. Sec. 1162(b); 25 U.S.C. Sec. 1321(b); 25 U.S.C. Sec. 1332(b). The exception or "savings clause" states:

> Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; *or shall deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping or fishing or the control, licensing, or regulation thereof.* (emphasis added)

It seems relatively clear that Congress intended, as well as fundamental statutory construction would require, that all of the sections of P. L. 280 (2), (4), (6) and (7) be read in pari materia. The U.S. Supreme Court had even found in *Menominee Tribe of Indians v. U. S.*, 391 U.S. 404, 20 L. Ed 2d 697, 88 Sup. Ct. 1705 (1968), that Pub. Law No. 280 had to be read in pari materia with certain Indian termination acts passed by the same Congress. *Menominee* at p. 411.

In *Menominee*, the state of Wisconsin took the position, in 1962, that the Menominees were subject to Wisconsin's hunting and fishing regulations because the Indians hunting and fishing negotiations had been abrogated by Congress when it passed the Menominee Indian Termination Act of 1954, which took effect in 1962. The U. S. Supreme Court, speaking through Justice Douglas, found that the "savings clause" on its face contained no limitation and that it protected any hunting, trapping, or fishing nearly seven years before the Termination Act became fully effective in 1961. The Court found that the two acts had to be read together and meant that although federal supervision of the tribe was to cease and all tribal property was to be transferred to new hands, the hunting and fishing rights granted

72

or preserved by earlier treaties survived the Termination Act of 1954. (It should be pointed out that the harshness of such a termination act does not even apply to Florida and thus the Supreme Court's reasoning would appear to have an even stronger application to Florida and the Seminoles' reservation of hunting and fishing rights.)

In *The Quechan Tribe of Indians v. Rowe*, 350 F. Supp. 106 (S. D. Calif. 1972), the issues before the district court concerned (1) the jurisdiction of federal, state and Indian authorities over Indian tribal lands, (2) the extent state law enforcement authorities could enforce state criminal laws on Indian lands, and (3) the extent to which the tribe could enforce its own hunting and fishing laws without interference from state authorities. The Court found that due to the "savings clause" of Sec. 1162(b), where there was a conflict between Indian rights or law and state law, the state law was unenforceable on Indian land.

## II. TREATY DEFENSE

### C. *U.S. v. WHITE* (the "express provision" test)

In 1974, a case of major impact was decided by the Eighth Circuit U. S. Court of Appeals which has become the foundation for two interpretations of the intent of Congress regarding its relations with Indians. (*White* is very close to "all fours" with *State v. Billie*.)

In *U. S. v. White*, 508 F. 2d 453 (8th Cir. 1974), Jackie White, a member of the Red Lake Bank of Chippewa Indians and resident of the Red Lake Reservation, was observed shooting at a bald eagle within the confines of the reservation. He was charged with the unlawful taking of a bald eagle in violation of 16 U. S. C. Sec. 668(a), the Bald Eagle Protection Act. White argued that the Bald Eagle Act was inapplicable to tribal Indians on Indian reservations exercising traditionally guaranteed tribal hunting rights. The government argued that the Act was a general law of the United States and would therefore be applicable to all persons, including Indians, unless expressly provided otherwise.

The Eighth Circuit, through Judge Ross, took the position that areas traditionally left to tribal self government, those most often the subject of treaties, have enjoyed an exception from the general rule that congressional enactments, in terms applying to all persons, includes Indians and their property interests. *White* at p. 455. (Additional support for the proposition can be found in *Cheyenne—Arapaho Tribes of Oklahoma v. State of Oklahoma*, 618 F. 2d 665 (10th Cir. 1980).

Likewise, as to the government's argument that the last federal act or statute which was passed in time should be given preference, the Court concluded that generally, in the case of a conflict between an Act of Congress and a treaty, the one last in date must prevail. However, said the Court, a treaty will not be deemed to have been abrogated or modified by a later statute unless such purpose on the part of Congress has been clearly expressed. Thus, the Act should be harmonized with the letter and spirit of the treaty so far as that reasonably can be done, since the intention to alter, and pro tanto, abrogate, the treaty is not to be lightly attributed to Congress, citing *U.S. v. Rayne*, 264 U.S. 446, 44 S. Ct. 352, 68 L. Ed. 782 (1924) and *Lone Wolfe v. Hitchcock*, 187 U.S. 553, 23 S. Ct. 216 47 L. Ed. 299 (1903). *White* supra at 456.

In the case at bar, we don't even have the conflict of *White* regarding an after passed federal protected species act. Instead, we have a state law which draws its power and authority from a federal act (Pub. L. No. 280) which contains a "savings clause", which must be read in pari materia with all of the other parts of the Act, as well as prior Indian treaties. The rights of the Seminoles in the case at bar would appear to be as strong as, if not even stronger than, those of the Red Lake Band of Chippewas.

The fact that the Act alleged to have been violated by the Defendant in *White* was a federally protected species (much like the panther statute) was of no legal significance to the Eighth Circuit because the legislative history of the Act as amended reflected a letter from the Assistant Secretary of the Interior, dated 5 Feb. 1962, discussing the veneration of eagles by Indians, 108 Cong. Rev. 22272 (1962). (The same facts are accurate for the panther vis-a-vis the Seminoles). Contemporaneous with the recommendation to Congree that it include the golden eagle in the Act, the Department of Interior took the position in a memorandum from the Office of the Solicitor, U. S. Dept. of the Interior, Washington, D.C., to the Director of the Bureau of Sport Fisheries and Wild Life, dated 26 April 1962, that:

A treaty Indian is not subject to the Migratory Bird Act while on his own Indian reservation. The same is true, by analogy, of the Bald Eagle Act. While they remain on their reserved land, your Bureau is without authority to prevent Indians from taking and possession protected migratory birds. *White* supra at 458.

The analogy of the arguments and reasoning of the majority in the *White* case as applied to the case at bar appear to be overwhelming and the majority opinion is persuasively adopted in the *Billie* case.

74

(The dissent in *White,* by Judge Lay, basically became the *Fryberg* case and will be discussed later in this opinion.)

The magnitude and power of the law to be given the treaties between Indians and the United States, as well as the efficacy of the "savings clause" in Pub. L. No. 280 to retain the tribal hunting and fishing rights can briefly be described in *Arnett v. 5 Gill Nets,* 48 Cal. App. 3d 454 (1st DCA Ca. 1975), where the court found that the hunting and fishing rights are preserved on former reservation lands that were no longer owned by the Indians (property on which nets found owned by a private logging company) and where they had specifically reserved these rights when they had sold the land to non Indians; and similarly, *Antoine v. State of Washington,* 420 U.S. 194, 95 S. Ct. 944, 43 L. Ed. 2d 129 (1975), where Indians had reserved hunting rights on lands ceded back to the United States. See also, *New Mexico v. Mescalero Apache Tribe,* 103 S. Ct. 2378 (1983), where Justice Marshall, writing for the U. S. Supreme Court rejected the State of New Mexico's assertion that it had *concurrent jurisdiction* and could thus theoretically superimpose its own hunting and fishing laws on the Mescalero Apache tribe's regulatory scheme. The Supreme Court found that it was beyond doubt that the Tribe lawfully exercised substantial control over the lands and resources of its reservations, including its wildlife, and that the Tribe's authority to regulate hunting and fishing preempted State jurisdiction, citing two significant reasons: (1) concurrent jurisdiction would effectively nullify the Tribe's authority to control hunting and fishing on the reservation because New Mexico could thus wholly supplant tribal regulations, and (2) concurrent jurisdiction would completely disturb and disarrange the comprehensive scheme of federal and tribal management established pursuant to federal law. *Mescalero* supra at 2388.

Before moving on to the last two major and maybe arguably distinct federal circuit court decisions regarding the treaty defense, it is necessary to point out that the U. S. Supreme Court in *Bryan v. Itasca County,* 426 U.S. 373, 48 L. Ed. 2d 710, 96 S. Ct. 2101 (1976), through Justice Brennan, attempted t put some congressional historical perspective on the application of Pub. L. No. 280 to Indian rights vis-a-vis their treaties and other federal statutes. The Court basically reaffirmed its prior decisions (1) that statutes passed for the benefit of Indian tribes are to be liberally construed, with doubtful expressions resolved in favor of the Indians, (2) that Indians stand in a special relation to the federal government from which the states are excluded unless Congress has manifested a clear purpose to terminate an immunity and allow states to treat Indians as part of the general

**75**

community, (3) that state laws generally are not applicable to tribal Indians on an Indian reservation except where Congress has expressly provided that state laws shall apply, but also (4) that Pub. L. No. 280 was plainly not meant to effect total assimilation, and nothing in its legislative history suggested otherwise, and (5) that the primary concern of Congress in enacting Pub. L. No. 280 was with the problem of lawlessness on certain Indian reservations, and the absence of adequate tribal institutions for law enforcement, citing Goldberg, Public Law 280: The Limits of State Jurisdiction Over Reservation Indians, 22 U.C.L.A. L. Review 535, 541-542 (1975).

Finally, the Court in *Bryan* noted two additionally significant factors (1) that present (1976 v. 1953) federal policy appeared to be returning to a focus upon strengthening tribal self government rather than the earlier "assimilationist" policy, and favorably footnoted the Ninth Circuit Court of Appeals expressed view in *Santa Rosa Band of Indians v. Kings County*, 532 F. 2d 655 (CA9 1975), at page 663, that "Courts are not obliged in ambiguous circumstances to strain to implement (an assimilationist) policy that Congress has now rejected, particularly where to do so will interfere with the present congressional approach to what is, after all, an ongoing relationship." *Bryan* supra fn. 14 at 721, and (2) that:

Our construction is also *more consistent with Title IV of the Civil Rights Act of 1968* (emphasis added), 82 Stat. 78, 25 U.S.C. Sec. 1321-1326. Title IV repeals Sec. 7 of Public Law 280 (Florida's authority) and requires tribal consent as a condition to further state assumptions of jurisdiction. . . . *Bryan* supra at 720.

II. TREATY DEFENSE

D. *DION* (8th Cir.) v. *FRYBERG* (9th Cir.)

The progeny of *U. S. v. White*, 508 F. 2d 453 (8th Cir. 1974), are arguably the most current, applicable and clear federal judicial expressions on the treaty defense. One case, *U. S. v. Dion*, 752 F. 2d 1261 (8th Cir. 1985), is basically a continuation of the 8th Circuit's prior *White* decision philosophy, whereas, the second case, *U. S. v. Fryberg*, 622 F. 2d 1010 (9th Cir. 1980), is essentially an adoption of the dissent in *White*. A closer analysis of these cases will demonstrate why this writer has been more persuaded and has adopted the *Dion* case as controlling and has rejected the *Fryberg* position. Thus, for the record,

THIS COURT ADOPTS THE *WHITE* POSITION AND ITS PROGENY *DION*, AND REJECTS *FRYBERG* (OR THE *WHITE* DISSENT)

*FRYBERG*:     (1)   "Conservation" test
                 (2)   "Surrounding circumstances and legislative history" test

*Fryberg* was decided in July of 1980. Dean Raymond Fryberg was charged by information with the unlawful taking, shooting and killing of a bald eagle in violation of 16 U.S.C. Sec. 668 and 668(c), commonly referred to as the Eagle Protection Act. While deer hunting on the reservation, Fryberg shot and killed an immature bald eagle located within reservation boundaries. Fryberg's defense was that this activity was protected by treaty and that his purpose in shooting the eagle was to obtain its feathers and other parts to decorate Indian ceremonial objects for use in organized tribal religious and cultural ceremonies. The district court found no evidence to support these contentions. Fryberg was convicted and appealed to the Ninth Circuit Court of Appeals, citing the *White* decision for authority.

The sole issue on appeal was whether the Eagle Protection Act modified or abrogated treaty rights to prohibit the taking and killing of bald eagles. The Court ruled on page 1016 of the opinion that:

> Even though there was no express statement on the "face of the Act" or in the legislative history that Congress intended to abrogate or modify Indian treaty hunting rights, we are convinced that it is clear from the "surrounding circumstances" and "legislative history", including the broad purpose of the Act to protect the bald eagle and prevent its extinction, that *Congress intended* (emphasis added by this Court) to modify Indian treaty rights to prohibit the taking of bald eagles, in the absence of a permit pursuant to Sec. 668(a).

The Ninth Circuit based its opinion on essentially four cases, which will now be discussed. The following analysis will not only show the reliance on these cases to have been misplaced and therefore misconstrued, but it will likewise demonstrate that the Ninth Circuit has now apparently taken a position that is contrary to developing Indian law, and essentially has said that all of the Indian treaty law is good except when applied to an endangered specie. This reasoning fails to comprehend that even though most people, especially the non Indians, would agree that eagles (and panthers/cougars) generally should be protected, this judicial implementation and superimposition of morals on the Indians is a questionable practice when it comes to striking down tribal treaty rights that have historically been honored and guaranteed by the U. S. Government for an historically unique group of people who were, in general, the first settlers of this country. As Chief Justice Marshall might have said in 1831-2, "Here they go again."

**77**

*Fryberg's* reliance on the dissent in *White* clearly shows that the dissenting argument was considered and rejected as neither judicially sound nor as legally correct. *Fryberg's* reliance on *Andrus v. Allard*, 444 U.S. 51, 100 S. Ct. 318, 62 L. Ed 210 (1979) and *U. S. v. Top Sky*, 547 F. 2d 486 (9th Cir. 1976) is erroneous as well as misleading because even the *Fryberg* court acknowledged that no argument or consideration was given to the treaty abrogation issue. Finally, in a review of the *Puyallup* cases: *Puyallup Tribe v. Washington Department of Game*, 391 U.S. 392, 88 S. Ct. 1725, 20 L. Ed. 2d 689 (1968), commonly referred to as Puyallup I, and *Washington Dept. of Game v. Puyallup Tribe*, 414 U.S. 44, 94 S. Ct. 330, 38 L. Ed. 2d 254 (1973), also known as Puyallup II, the courts found that an Indian treaty fishing right cannot be qualified or banned by a state law. However, and the most distinguishing issue in this case involved the Indians rights to *off-reservation commercial* (emphasis added) fishing rights, the state was allowed to regulate this type of activity.

There is, of course, no evidence or disagreement in the Florida case that there was any commercial activity alleged and this would further distinguish Florida's case from any of those relied upon by the Ninth Circuit Court of Appeals in *Fryberg*. Likewise, there is evidence in the Florida case, though not critical to this issue at this time, that the panthers were used in tribal religious and ceremonial purposes and that the Defendant, James Billie, is married into the Panther Clan of the Seminole Indian Tribe.

The *Fryberg* court, in attempting to distinguish away the prior holdings in *White* supra, *Menominee* supra, and the other rather established law in the area, used the following statements as additional authority for their position:

. . . . Rather it involves a *relatively insignificant modification* of the Indian's hunting rights. . . . The only apparent reason to hunt eagles is *for religious and ceremonial purposes.* . . . There was less reason to state expressly that treaty rights were modified than in those cases where *substantial infringements* were involved. *Fryberg* at page 1014. (Emphasis added by this Court.)

Quite frankly, the Ninth Circuit's apparent intentions are admirable, however, they are not really supported by the facts or the case law. More importantly, they appear to be chiseling away and further diminishing the tribal treaty rights that the Indians and their forefathers have historically died for. Such an abrogation should be clear and unequivocal and made by Congress, not the Courts. Such unique historical rights and privileges should have a better fate than to be

gradually eroded on the basis that they are "relatively insignificant", or only "for religious and ceremonial purposes", or acceptable where no "substantial infringements were involved."

*DION*: "Express reference" to treaty rights test.

Most recently, the Eighth Circuit Court of Appeals has had another opportunity to revisit *White* (after *Fryberg*), and it has somewhat tightened its prior position and interpretation with regard to the protected species act. *U. S. v. Dion*, 752 F. 2d 12161 (8th Cir. 1985). In this case, government agents conducted an undercover operation, "Operation Eagle", in South Dakota to investigate the killing and selling of bald and golden eagles and other protected birds. As a result, the defendants were arrested for a violation of the Eagle Protection Act.

In excising out the portions regarding the number of defendants charged and the specific counts, the thrust of the lower district court's opinion was that based upon the *White* case, the Indians could not be charged with a violative taking under the Act because it was done on the Indian reservation, but that the Indians could be tried and convicted of violative acts with regard to commercial transactions. Both sides appealed to the Eighth Circuit, the government arguing that *White* should be overruled and the defendants arguing that *White* should be extended to shield the Indians for all the criminal charges.

Judge Ross, as he had in the *White* case, again wrote the majority opinion reaffirming *White's* application to the Endangered Species Act, but narrowing its application to non commercial transactions. The *Dion* opinion is an extremely well reasoned attempt to combine all of the prior case positions and to clearly identify the issues as well as the answers from a logical as well as constitutionally sound framework. This they did and this is why this Florida Court adopts *Dion* and finds it controlling regarding the "treaty defense".

The *Dion* court adopted the U. S. Supreme Court's language from *Washington v. Washington State Commercial Passenger Fishing Assoc.*, 443 U. S. 658, 675-676, 99 S. Ct. 3055, 61 L. Ed. 2d 823 (1979), and F. Cohen's *Handbook of Federal Indian Law*, 222 (1982 ed.) to the effect that distinctive principles of construction have been developed for the purpose of interpreting the scope of Indian treaties, partially due to the United States' "superior negotiating skills and superior knowledge of the language in which the treaties were recorded", and this superiority has led to the development of the general principle that in construing Indian treaties, the courts have required that the treaties be liberally construed to favor Indians, that ambiguous

**79**

expressions in treaties must be resolved in favor of the Indians, and that the treaties should be construed as the Indians would have understood them. *Dion* at p 1263. The Court then cited voluminous U. S. Supreme Court and Ninth Circuit Court of Appeal cases to support this principle, including *U. S. v. Top Sky*, supra and Wilkinson & Volkman, "Judicial Review of Indian Treaty Abrogation", 63 Calif. L. Rev. 601 (1975).

The court after reviewing *White* supra and *U. S. v. Winans*, 198 U. S. 371, 25 S. Ct. 662, 49 L. Ed. 1089 (1905), basically found that the right to hunt and fish was part of the larger bundle of rights possessed by the Indians in the lands used and occupied by them and that what the Indians traditionally could do with reference to hunting and fishing before the treaty, they still could do if not specifically prohibited by the treaty or later federal law. Thus, since the historical evidence reflected that the Indians had no expectation of a treaty right to sell eagles and there was evidence that such a practice was deplored as a matter of tribal religion and custom, it could not be protected.

In contrast, in our Florida case, there is ample evidence that there was no commercial selling activity, that there was no expectation historically of the commercial selling of panther parts, but that panthers and panther parts were utilized in the practice of the Seminole Indian religion and culture for hundreds of years. See *The Medicine Bundles and Busks of the Florida Seminoles*, 7 Florida Anthropologists 31, 1954, by Dr. William Sturtevant, curator of Ethnology, Natural History Museum, the Smithsonian Institute; and the depositions of defendant's witnesses, Buffalo Jim and Susie Billie, whose statements were taken by the State's Attorney on 24 October 1984.

The *Dion* court then goes on to analyze the *Fryberg* decision and its two main parts or arguments: (1) surrounding circumstances and legislative history, and (2) the conservation argument.

As to the surrounding circumstances test, the Court basically rejected this analysis because it had been a civil violation case which *Fryberg* used as its basis of support for its opinion and the charge in *Dion*, as in *State v. Billie*, was a criminal charge for which the *Dion* court would require the express reference test. The Court defined "express reference" as referring to an express reference in the Act itself or in the legislative history of the Act. *Dion* supra at p. 1267.

The *Dion* courts decision was based upon two compelling factors. First, the express reference test is more desirable than the surrounding circumstances test because it leads to greater clarity and more consistent results. Second, the clarity provided by the express reference test is critical where criminal sanctions may be imposed.

As to the conservation argument, the court found the government's argument might apply to "in common" shared treaty rights, but not to "on-reservation" treaty rights, as found in this case, which were exclusive. Likewise, the government did not establish or prove that the eagle would become extinct if the Indians were permitted to take eagles within the scope of their treaty rights. The court noted that it was not faced with the problem of the imminent extinction of a specie and that Congress could still expressly act on this issue if it chose to do so. *Dion* supra fn. 14 at p. 1268. (Obviously, this same argument applies to the Florida panther or cougar.)

The Court found that the Indians in *Dion* (and by analogy, the Indians in *State v. Billie*) would not have understood the treaty as permitting other sovereigns to regulate their exclusive "on-reservation" treaty hunting rights. Accordingly, these rights were not subject to conservation regulations (or by analogy state laws) unless statutory abrogation of those rights had been specifically effected.

The *Dion* Court concluded on page 1270 with the following comment that has poignant application to the Florida panther case, especially where a felony of the third degree is involved:

. . . . The plaudible purpose behind conservation statutes gives rise to strong emotions, especially where bald eagles are concerned, but does not necessarily reveal a congressional intent to eliminate rights protected by federal treaties.

The Defendant Billie has an even stronger case in Florida. This is primarily because almost all of the courts dealing with the passage of Pub. L. No. 280 have recognized the efficacy of the so called "savings clause". Therefore, Florida's power to regulate or prohibit hunting and fishing activities by a full blooded Seminole Indian on the Seminole Indian Reservation must be construed in pari materia with the other sections of Pub. L. No. 280. We are dealing with an alleged violation of state law, not federal law. Obviously, the state cannot have any greater authority in this area than that which was given to them by the federal government. If the court cases so clearly reveal that the federal government doesn't have jurisdiction in this protected species area, but for some very limited exceptions, it is abundantly clear that the State of Florida has none. This conclusion is inescapable and has no relationship to the nature of the protected specie, whether the legislative body determines the eagle, the panther, or the mocking bird to be the selected species. It can be accomplished, but it must be so done in a clear and unequivocal manner when dealing with American Indians and their treaties with the American Government. It is as true today as

**81**

it was when stated by Chief Justice Marshall in 1832 that this relationship was formed by one historically sovereign nation claiming and receiving the protection of a more powerful nation: not that of individuals abandoning their national character, and submitting as subjects to the laws of a master. *Worcester* supra at p. 555. The rest of the peoples of the United States may have thus submitted, but our relations with the Indians of America have been historically unique. To honor and respect these treaty rights, even if we disagree with their results or effect, is, in essence, the history of America, and in turn, that is what has made America unique among nations of this world.

## STATUTORY CONSTRUCTION

### III. CIVIL/REGULATORY v. CRIMINAL/PROHIBITORY DEFENSE

Essentially, the argument of the defendant has been that the statute with which he is charged is, in reality, a part of the State of Florida's regulatory scheme over hunting and fishing, and, just because the Florida Legislature attaches a criminal penalty to its violation, it is not really a crime and is thus controlled by the cases of *Seminole Tribe of Florida v. Butterworth*, 658 F.2d 310 (5th Cir. 1981—now 11th Cir.); *U. S. v. Marcyes*, 557 F. 2d 1361 (9th Cir. 1977); and *The Barona Group of the Capitan Grande Band of Mission Indians v. Duffy*, 694 F. 2d 1185 (9th Cir. 1982). Additionally, the defendant cites the "savings clause" of Pub. L. No. 280 and its interpretation as found in *Bryan v. Itasca County*, 426 U.S. 373, 96 S. Ct. 2102, 48 L. Ed. 2d 710 (1976) and its progeny (much of the analysis of which has been done already in the prior part of this opinion and is readopted with reference to the impact of the "savings clause" to state civil and criminal statutes and regulations).

The State argues that pursuant to the federal grant of authority provided in the Act of August 15, 1953, Sec. 1 et seq., 67 Stat. 588; 18 U.S.C.A. Sec. 1162; and 28 U.S.C.A. Sec. 1360, it had the authority to adopt F. S. 285.16 and to bring all Indians and their reservations within the authority and control of the criminal and civil laws of the State of Florida. For the reasons previously expressed in this opinion regarding the treaty defenses, and the additional reasons that follow, the state's assumption of authority is limited to the scope of *Bryan* supra and its progeny and the state's law is incapable of passing muster against Defendant Billie in this particular case.

Let us first look at the statute involved. F. S. 285.16 was adopted in 1961 pursuant to the authority of Act of August 15, 1953, Sec. 1 et

seq., especially Sec. 7, 67 Stat. 590 (1953), repealed by Pub. L. No. 90-284, Title IV, Sec. 403, 82 Stat. 79 (1968).

Civil and criminal jurisdiction; Indian reservation. (1) The State of Florida hereby assumes jurisdiction over criminal offenses committed by or against Indians or other persons within Indian reservations and over civil causes of action between Indians or other persons or to which Indians or other persons are parties rising within Indian reservations. (2) The civil and criminal laws of Florida shall obtain on all Indian reservations in this state and shall be enforced in the same manner as elsewhere throughout the state.

The criminal statute the defendant is alleged to have violated is F. S. 372.671 which reads as follows:

Florida panther; killing prohibited; penalty. (1) It is unlawful for any person to kill that member of Florida's "endangered species," as defined in s. 372.072(3), known as the Florida panther. (2) Any person convicted of unlawfully killing a Florida panther is guilty of a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

Likewise, the Florida Game and Freshwater Fish Commission has by Chapter 39-27.02 and 39-27.03 designated the Florida panther (felis concolor coryi) as an endangered species. (Both the State and the Defense agree that the Florida Legislature changed the statutory definition of the Florida panther because of lack of proper definitions and potential vagueness in application and construction.) The Game and Fish Commission gets its authority from F. S. 372.021 which states:

372.021 Powers, duties, and authority of commission; *rules, regulations, and orders.* The Game and Fresh Water Fish Commission may exercise the powers, duties and authority granted by Sec. 9, Art. IV of the Constitution of Florida by the adoption of *rules, regulations, and orders* in accordance with Chapter 120. (emphasis added).

Section 9, Article IV of the Florida Constitution states in pertinent part:

Section 9. Game and fresh water fish commission. There shall be a game and fresh water fish commission, composed of five members appointed by the governor subject to confirmation by the senate for staggered terms of five years. *The commission shall exercise the regulatory and executive powers of the state with respect to wild animal life and fresh water aquatic life,,* except that all license fees for taking wild animal life and fresh water aquatic life and penalties

83

for violating regulations of the commission shall be prescribed by specific statute. The legislature may enact laws in aid of the commission, not inconsistent with this section. (emphasis added)

Thus, we finally see that from a derivative powers analysis, the statutes, implementing the Game and Fish Commission's regulatory powers, may not be quite as criminal as they at first glance appear. Additional inconsistencies appear within the Florida statutory scheme in that F. S. 285.09(1) contains additional exceptions to the "alleged general prohibitory" nature of F. S. 372.61, in that F. S. 285.09(1) provides:

(1) It is *lawful* for members of the Miccosukee Tribe and members of the *Seminole Tribe* to *take wild game* and fish at *any time* within the boundaries of their respective reservations and in the exercise of hunting, fishing and trapping rights *within the Big Cypress Reserve* under P. L. 93-440, and under F. S. 380.055(8), provided that *game* may be taken *only for food for the Indians themselves*." (emphasis added)

Florida Statute 380.055(8), further expands the hunting, fishing and trapping rights by stating:

"Members of the *Seminole Tribe* may continue their usual and customary use and occupancy of lands and waters within the Big Cypress areas, *including hunting*, fishing and trapping on a subsistence basis and *traditional tribal ceremonies*." (emphasis added)

The Defendant, James Billie, who is undeniably a member of the Seminole Tribe, and who was on the Big Cypress Reservation at the time of the alleged incident, appears to fall within the class of persons to whom F. S. 372.671 does not apply. Florida Statute 285.09(1) allows the taking of "wild game" . . . . "at any time" without any exceptions, reservations or exclusions.

The Florida Legislature, in adopting F. S. 285.09(1) and F. S. 380.055(8), seems to have intended to protect and exclude members of the Seminole Tribe from the general application of hunting and fishing laws of the State of Florida, as long as the game was taken for food for the Indians or for traditional tribal ceremonies. In doing so, the Florida Legislature recognized and guaranteed the inherent rights Indians possess in hunting and fishing for food and tribal ceremonies. The Florida Legislature further noted Pub. Law No. 93-440 88 Stat. 1257, Laws of the United States, which established the Big Cypress Preserve, but reserved to:

"members of the Seminole Tribe of Florida . . . their usual and

84

customary use . . . including hunting, fishing and trapping on a subsistance basis and traditional Tribal ceremonials." (P. L. 93-440)

By construing both F. S. 285.09 and F. S. 380.055(8) together, a violation of F. S. 372.671 would appear to require an allegation by the State that the Defendant, a Seminole Indian within the Big Cypress Reservation, did not kill the game taken for food for himself or for traditional tribal ceremonies.

Likewise, the conflict found in Florida Statute 372.671 prohibiting the killing of panthers and the exceptions in Florida Statute 285.09(1) should be construed according to the rules of general statutory construction concerning criminal statutes found in the laws of the State of Florida.

Florida Statute 775.02(1) states:

"The provisions of this code and *offenses defined by other statutes* shall be strictly construed; when the language is susceptible of differing constructions; *it shall be construed most favorably to the accused.*"

It is apparent that Florida Statute 371.672 and Florida Statute 285.09 are susceptible of differing constructions and should be resolved in favor of the Defendant.

Finally, moving away from the apparent conflicts and inconsistencies of the state's criminal statutory construction scheme, let us briefly visit the case law for help as to what is civil/regulatory and criminal/prohibitory.

In *U. S. v. Marcyes*, supra, the Ninth Circuit was faced with a determination of whether the Defendant's possession and sale of fireworks on the Puyallup Indian Reservation was a violation of the Washington and federal criminal statutes and whether it was properly prohibited as a criminal act or was a civil regulatory act and not covered. Even though the court found that it was criminal prohibitory for fireworks, there was dicta by the court on Page 1364 to the effect that:

The possession of fireworks is not the same situation encountered in other *regulatory schemes such as hunting and fishing* . . . . (emphasis added).

Moreover, one other argument made by the defendants, which was approved in *Marcyes*, and which has application to the *Billie* case, is that a state's regulatory scheme should not be included in the criminal statute section because a state could thereby enforce its regulatory system on the federal jurisdiction by making criminal the failure to

comply with those regulations. *Johnson v. Yellow Cab Transit Co.*, 321 U. S. 383, 64 S. Ct. 622, 88 L. Ed. 814 (1944). This is especially true with regard to Indians and the exercise of their treaty rights because a state could thereby implement all of its regulatory provisions on Indian reservations and thus destroy the strong concept of tribal sovereignty established in such cases as *Bryan v. Itasca County*, supra and *Santa Rosa Band of Indians v. Kings County*, 532 F. 2d 655 (9th Cir. 1975).

In 1981, the *Butterworth* decision adopted among other cases the decision in *Bryan* and *Marcyes* regarding the distinction between a state statute which claimed to be criminal prohibitory but upon closer examination was found to be civil regulatory. Judge Morgan, writing for the Court in *Butterworth* cited the *Marcyes* case for authority and said:

> Although the inclusion of criminal sanctions makes it tempting at first glance to classify the statute as prohibitory, the statute cannot automatically be classified as such. A simplistic rule depending on whether the statute includes penal sanctions could result in the conversion of every regulatory statute into a prohibitory one. *Butterworth* supra at p. 314.

In finding the State of Florida's bingo statute to not be criminal prohibitory, but instead civil regulatory, the Fifth Circuit agreed that it was a close question. However, after reviewing the U. S. Supreme Court's prior interpretations of Pub. L. No. 280, particularly as defined in *Bryan* supra, the court acknowledged that this was indeed a case where statutes passed for the benefit of dependent Indian tribes were to be liberally construed with doubtful expressions being resolved in favor of the Indians. The *Butterworth* court concluded that although the regulatory bingo statute could arguably be interpreted as prohibitory, the resolution must be in favor of the Indian tribe. (The *Butterworth* position has been adopted by the Ninth Circuit Court of Appeals in *Barona* supra).

## CONCLUSION

It has been shown, that the treaties and laws under review were within the due exercise of the constitutional powers of the federal government; that they remain in full force, and consequently must be considered as the supreme laws of the land. These laws and treaties throw a partial shield over the American Indians. These treaties guaranteed them their rights of occupancy, of self-government, and the full enjoyment of those historical hunting, fishing, tribal and religious/ceremonial customs, which they still retain in their developing cultural tradition.

If it's going to become the policy of the government to withdraw its protection from the Indians who reside within the limits of the respective states, the laws and treaties which impose the respective duties and obligations between the American Government and the American Indians should only be abrogated by clear and concise expressions of intent and understanding addressed specifically to those treaty rights.