UNITED STATES of America, Plaintiff,

v.

Jose I. ABEYTA, Defendant.

Crim. No. 85–79–JB.

United States District Court,
D. New Mexico.

April 9, 1986.

Jennifer A. Salisbury, Asst. U.S. Atty., Albuquerque, N.M., for plaintiff.

S. James Anaya, Albuquerque, N.M., for defendant.

## MEMORANDUM OPINION

BURCIAGA, District Judge.

THIS CASE requires the court to consider competing claims to a treasured bird, the eagle: the claim of the American people to the eagle as the symbol of their national unity, strength, and purpose, and the claim of the Indian people of the New Mexico pueblos to the eagle as the overseer of human life and the messenger to the spirit world. In this action, the government's legitimate cultural and conservation interests in the eagle are in conflict with the eagle's veneration as a religious symbol. For the reasons set out in this opinion, the court concludes that the Bald and Golden Eagle Protection Act, 16 U.S.C. § 668, does not apply to the taking solely for religious purposes of a golden eagle within the exterior boundaries of the Isleta Pueblo. The government's action against the defendant for killing a golden eagle for use of its feathers in a religious ceremony therefore must be dismissed.

## I. INTRODUCTION

On January 4, 1985, an investigative officer of the Department of the Interior filed with the court a violation notice charging the defendant Jose I. Abeyta (Abeyta) with knowing possession of parts of a golden eagle without a permit in violation of the Bald and Golden Eagle Protection Act, 16 U.S.C. § 668. On May 14, 1985, Abeyta filed a motion to dismiss the action for the reason that the act does not apply to him. This is so, he contends, because of protections afforded to him under the Treaty of Guadalupe Hidalgo, 9 Stat. 922 (1848). Even if this were not so, Abeyta maintains, application of the act to him under the circumstances presented by this case would be in derogation of his right, secured by the first amendment to the United States Constitution, to exercise his religion freely. Both the government and Abeyta have briefed the facts and the law extensively and on August 9, 1985 the court held an evidentiary hearing on issues presented.

For the reasons set out in this opinion, the court concludes that the act does not apply to Abeyta. Were this not so, prosecution of Abeyta for the acts here alleged, under all the circumstances here presented, would unlawfully constrain Abeyta's free exercise of his religion. Accordingly, Abeyta's motion to dismiss the action against him will be granted.

## II. FACTS

In 1940, Congress passed the Eagle Protection Act, 16 U.S.C. § 668 *et seq.*, prohibiting the knowing possession or sale of any bald eagle, alive or dead, or any part, nest, or egg of the protected birds. The act was amended in 1962 to extend its protection to golden eagles and was further amended in 1972 to increase the punishment for violations and to reduce the degree of knowledge required for conviction.

The 1962 amendments to the act also authorized the Secretary of the Interior to permit, when permission is compatible with preservation of the protected birds, the taking of eagles for various reasons including "for the religious purposes of Indian

tribes." 16 U.S.C. § 668a. In furtherance of this provision, the Secretary has promulgated regulations controlling the taking of eagles for religious purposes. 50 C.F.R. § 22.22 (1984). The regulations establish a labyrinthine application procedure by which individual Indians may apply for permits to take or possess eagle parts for ceremonial use. As part of the Secretary's administrative apparatus, the United States Fish and Wildlife Service has established at Pocatello, Idaho a depository for eagle parts and feathers. Applications from Indians for feathers for ceremonial use are, in theory, to be filled from the depository. No eagles are harvested for their parts or feathers. Indeed, no application to kill or otherwise harm a golden eagle has ever been granted. The inventory at the depository is constituted of carcasses of eagles that were killed by accident or that died of natural causes.

Abeyta is a lifelong resident and member of Isleta Pueblo. The pueblo stands within the lands conveyed to the United States under the Treaty of Guadalupe Hidalgo. Abeyta is also a member of the Katsina Society, an independent and sometimes secretive religious society that engages in traditional ceremonial practices deeply rooted in ancient pueblo religion. The tradition and lore of the Katsina Society, like others of its kind, require the ceremonial use of eagle feathers and parts.

In its ritual and reverent use of eagles and their feathers in religious ceremony, the Katsina Society is indistinguishable from myriad pueblo religious fellowships. The central tenets of ancient Indian religious faith are shared among New Mexico's pueblos and, of all birds, the eagle holds an exalted position in all pueblo religious societies. The use of their feathers, particularly from the tail and wings, is indispensable to the ceremonies of the Katsina Society and other pueblo rituals.

The ceremonial use of the feathers is especially important at the winter solstice. Then, the Katsina, or spirit of life, and the eagle, the embodiment of the overseer of life, are the central forces in pueblo religious belief. The eagle is the primary messenger to the spirit world and the ceremonial use of its feathers permits the living to communicate with the spirit world beyond. At the solstice, a fresh set of eagle feathers, including those from the tail, is required to finish costumes used in the Katsina solstice ritual. For the Katsina Society at Isleta Pueblo, it is of religious significance that these feathers be of a bird taken from aboriginal Isleta lands. Without such feathers, the religious purposes of the solstice ceremonies are defeated and a cardinal sacrament of the Isleta people is forfeited.

On or about January 4, 1985, Abeyta killed a golden eagle upon the aboriginal lands and within the exterior boundaries of the Isleta Pueblo, about five miles east of the central Isleta village. Abeyta's sole purpose in killing the eagle was to procure its feathers for use of them in the religious ceremonies of the Katsina Society.

Abeyta did not avail himself of the procedures established by the Secretary to procure feathers for ceremonial purposes. In any event, it would not have been fruitful for him to have done so. The federal eagle depository established and operated by the Fish and Wildlife Service does not effectively fulfill the pueblos' need for eagle feathers for ceremonial use. The life span of the golden eagle is 15 to 20 years. Each breeding pair, of which there are currently approximately 150 in New Mexico, produces an average of one young per year. Few golden eagles die of natural causes each year and, although some die of unnatural causes such as trapping, poisoning, electrocution, shootings, collision with power lines, and loss of habitat, there are nevertheless insufficient carcasses to meet the religious needs of the pueblo societies. Thus, the depository takes 18 months to two years to fill requests from the pueblos for carcasses, tail feathers, and full sets of wing feathers for ceremonial use. As of August, 1985 there were 527 pending applications for eagle feathers or parts, nationwide. Of these, 55 percent, or 274, were pending in Fish and Wildlife Service Region II which comprises New Mexico, Arizona,

Texas, and Oklahoma. Four of these pending applications were from members of Isleta Pueblo. It is clear that the depository does not provide applicants with fresh feathers annually for the solstice ceremonies. Despite the shortage, federal authorities have never issued a permit to kill a golden eagle for Indian religious purposes in New Mexico or anywhere else.

Moreover, the intricate application procedure, as it currently operates, is itself unnecessarily intrusive and hostile to religious privacy when viewed in light of the conservation goals it seeks to achieve. The applicant must certify that he is an Indian and will use the feathers or parts for religious purposes. He must identify religious leaders and ceremonies to federal officials so that the government may gauge the religious character of the proposed use. These procedures invade the private, even secret, province of Indian religious conviction and offend the ancient tradition of pueblo religious independence.

This scrupulous supervision of religious use of eagle feathers is inconsistent with other government policy and is apparently unnecessary as a conservation measure. The Fish and Wildlife Service has issued and continues to issue permits to non-Indian ranchers to take depredating golden eagles. The golden eagle is not an endangered species. Its New Mexico population is not in decline. Uncontradicted testimony of a New Mexico Game and Fish Department biologist establishes that some golden eagles could be harvested without a deleterious impact upon the population.

## III.  INDIAN RELIGIOUS RIGHTS

Abeyta requests the court to dismiss on two grounds the government's action against him. He first asserts that the Treaty of Guadalupe Hidalgo, 9 Stat. 992 (1848), secured to him the right to take an eagle for ceremonial religious use and that Congress, having failed expressly to abrogate the treaty when it enacted the Bald and Golden Eagle Protection Act, did not intend to extend the act's conservation measures and sanctions to the Isleta people

acting within the exterior boundaries of the pueblo. Since Congress did not intend the act to extend to his taking of an eagle for religious purposes, Abeyta contends he cannot be prosecuted for a violation and the government's action therefore must be dismissed. Moreover, Abeyta maintains, Congress could not constitutionally prohibit the taking for religious purposes of an eagle by a member of the Isleta Pueblo upon aboriginal lands; that such a prohibition would burden Abeyta's free exercise of his religion and offend the guarantees of the first amendment to the United States Constitution.

The court agrees that the Treaty of Guadalupe Hidalgo did confirm and perpetuate religious rights, including the use of eagle feathers in the rituals of Abeyta's religious fellowship, and that Congress did not abrogate this protection when it sought to conserve and nurture America's eagle population. The court also holds that, upon the facts presented, Abeyta's taking of a golden eagle for use of its feathers in a Katsina Society sacramental ceremony is protected by the first amendment of the United States Constitution. Because the golden eagle is not an endangered species, and because the administrative apparatus established to accommodate Indian religious needs is unwieldy, unresponsive, and ineffectual for Abeyta's purposes, Abeyta's free exercise of his religion would be unnecessarily, unduly, and impermissibly burdened if Congress extended the sanctions of the Bald and Golden Eagle Protection Act to Abeyta's conduct.

## A.  TREATY OF GUADALUPE HIDALGO

By the Treaty of Guadalupe Hidalgo, the hostilities between Mexico and the United States that had flared into the Mexican War ceased. The treaty, signed February 2, 1848, guaranteed the security and freedom of all Mexican citizens residing in the ceded territories. By article IX of the treaty, the United States expressly promised to protect all Mexican citizens "in the free enjoyment of their liberty and property,"

and pledged to the Mexican government that its nationals then residing in the ceded territories would be *"secured in the free exercise of their religion without restriction"* (emphasis added).

The Indians of the New Mexico pueblos, of which Isleta is one, have an ancient, proud, and rich history. The term "pueblo" derives from the stone and adobe villages that have long signified their settled and mature social development. In this, the native Americans of the pueblos have a markedly different tradition from most other North American Indians. The pueblo Indians were wards of the Spanish crown. More importantly, the pueblo Indians later became full citizens of the Mexican nation, with all the rights and privileges appurtenant to citizenship. It was continuing respect for these rights upon which the Mexican government insisted when it negotiated the settlement of hostilities with the United States and the cession of territory in 1848. *See* F. Cohen, *Handbook of Federal Indian Law* 383–88 (1942); Cohen, *The Spanish Origin of Indian Rights in the Law of the United States,* 31 Georgetown L.J. 1, 15–21 (1942).

■ The Treaty of Guadalupe Hidalgo, like any other treaty to which the United States is a party, may be repudiated, abrogated, or modified as the Congress shall deem suitable. It is of no legal significance that the treaty is with a still-existing, foreign, extraterritorial sovereign. As with treaties with Indian civilizations now within the nation's borders, the treaty has the force of law because it is an act of Congress and, as such, may be altered or repealed as Congress, acting within its constitutional powers, may decide. "In our jurisprudence, it is well settled that the provisions of an act of Congress, passed in the exercise of its constitutional authority, on this, as on any other subject, if clear and explicit, must be upheld by the courts, even in contravention of express stipulations in an earlier treaty." *Fong Yue Ting v. United States,* 149 U.S. 698, 13 S.Ct. 1016, 37 L.Ed. 905 (1893); *see also Chae Chan Ping v. United States,* 130 U.S. 600, 9 S.Ct. 623, 32 L.Ed. 1068 (1889).

■ Because the Treaty of Guadalupe Hidalgo afforded protection to the pueblos, however, it is in this dimension more than a settlement between then hostile nations: it is a living Indian treaty. It memorializes a pledge to the Mexican nation that the United States would honor the rights of Indians living in the ceded territory at the time the treaty was executed. As such, it is a treaty of the United States securing the rights of native Americans, and it is to be construed according to the special principles controlling interpretation of Indian treaties. *See State of New Mexico v. Aamodt,* 537 F.2d 1102 (10th Cir.1976), *cert. denied,* 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 572 (1977); *see also Pueblo of Isleta v. Universal Constructors, Inc.,* 570 F.2d 300 (10th Cir.1978). It is against this background that the court must discern whether Congress, in enacting the eagle protection laws, has intended to constrict the treaty rights of New Mexico pueblo Indians.

Federal enforcement of the congressional initiative to safeguard the remaining eagle population has brought about some skirmishing with Indian defendants who seek to continue the commercial use of eagle feathers in artifacts. In *Andrus v. Allard,* 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979), the Supreme Court, reversing a three-judge court, held that the ban on *sales* of eagle parts imposed by the Migratory Bird Treaty Act, 16 U.S.C. § 703, and the eagle protection laws apply to feathers and parts lawfully acquired before Congress prohibited the taking and possession of the protected birds. In *United States v. Dion,* 752 F.2d 1261 (8th Cir.) *(en banc), cert. granted,* —— U.S. ——, 106 S.Ct. 270, 88 L.Ed.2d 225, *on remand,* 762 F.2d 674 (1985), the court, determined that Congress did not intend to abrogate the Yankton Sioux Treaty, 11 Stat. 743 (1858), when it enacted the eagle protection laws, but found no treaty right to hunt the protected birds for *commercial* purposes and affirmed the district court's refusal to dismiss charges that the Dions had taken and

*sold* bald and golden eagles and other endangered birds.

In *United States v. Fryberg*, 622 F.2d 1010 (9th Cir.1980), the court affirmed the conviction of an enrolled member of the Tulalip tribe of Washington state for shooting and killing an immature bald eagle. The district court had found as a fact that Fryberg had *not* killed the eagle for religious purposes and Fryberg did not contest that ruling on appeal. In *United States v. Top Sky*, 547 F.2d 486 (9th Cir.1976), the court affirmed the conviction of a father and son, members of Idaho's Chippewa-Cree tribe, who *sold* golden eagles and their feathers and other parts. The appellate court did not decide whether Congress intended the eagle protection laws to abrogate the Fort Bridger Treaty, 15 Stat. 673 (1868) with the Top Skys' tribe because purely commercial sales of eagles were deplored by traditional Chippewa and Cree religions and the defendants' free exercise of their religion thus could not have been burdened in any event.

In *United States v. White*, 508 F.2d 453 (8th Cir.1974), a divided court held that Congress did not intend by the eagle protection laws to abrogate the aboriginal hunting rights of Minnesota's Red Lake band of Chippewa Indians, and affirmed the trial court's dismissal of the government's information against White, who had been observed shooting at a bald eagle within the confines of his reservation. In dissent, Lay, J. wrote that legislative history and the language of the act and amendments evinced a clear congressional realization that "conservation can be accomplished only by the enactment of a law which applied to *all* persons, prior treaties notwithstanding," and would have construed the eagle protection laws to abrogate aboriginal Indian hunting rights. The defendant White had asserted only his traditional right to hunt on the reservation and raised no defense based upon religious belief.

In *United States v. Allard*, 397 F.Supp. 429, 431 (D.Mont.1975), the district court, faced with a prosecution for *sale* of eagle feathers, concluded that the special legislative provisions designed to accommodate Indian religious needs were sufficient evidence that Congress "did have Indians in mind" when it enacted the eagle protection laws and that the act's prohibitions and sanctions therefore "apply to all persons regardless of treaties."

Each of these cases decides questions that are markedly different from the issues presented by Abeyta's motion to dismiss. The defendant is not charged with killing a protected eagle for commercial purposes or with selling an eagle or its feathers. It is undisputed, for purposes of this motion, that Abeyta killed the eagle to use its feathers in a Katsina sacrament. Moreover, the treaty rights asserted by Abeyta are of high import. The Treaty of Guadalupe Hidalgo, unlike the treaties considered by other courts, is an international compact securing *religious freedom* to Mexican citizens in the ceded territories. The court need not and does not decide what hunting rights might attach to the New Mexico pueblos by virtue of the 1848 accords between the United States and Mexico. It is the guarantee of religious liberty in article IX of the treaty that, according to the government, Congress abrogated when it enacted the eagle protection laws.

■ This court agrees with the majority in *White*, 508 F.2d, at 457, that to retreat from an earlier undertaking to respect Indian rights by enactment of the eagle protection laws, "it was incumbent upon Congress to expressly abrogate or modify the spirit of the relationship between the United States" and the affected Indian people. The court cannot infer an intent by Congress to abrogate the Treaty of Guadalupe Hidalgo. The stakes are too high and the legislative evidence too slight to warrant such a flamboyant deduction. The relationship between the United States Congress and native Americans is marked by the unique power of the national government and a corresponding fiduciary duty. In the circumstances in which claims of treaty abrogation arise, requiring Congress to act explicitly and expressly to repudiate its ear-

lier undertakings insures that the legislative process is consonant with "the most exacting fiduciary standards" to which the government has been held in its relations with native Americans. *Seminole Nation v. United States,* 316 U.S. 286, 296–97, 62 S.Ct. 1049, 1054–55, 86 L.Ed. 1480 (1942); *see* Wilkinson & Volkman, *Judicial Review of Indian Treaty Abrogation: "As Long as Water Flows, or Grass Grows Upon the Earth"—How Long a Time Is That?,* 63 Cal.L.Rev. 601, 659–61 (1985).

■ Congress unmistakably intended to guard the bald and golden eagles the nation has remaining. It took bold steps to accomplish its purpose. Indeed, the eagle protection enactments are statutes of general applicability and they apply to Indians unless such application would be in derogation of Indian treaty rights. *Federal Power Commission v. Tuscarora Indian Nation,* 362 U.S. 99, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960). Congress not having stated its intention, this court must conclude that Congress did not intend to repudiate its earlier undertaking to honor the religious freedom of the pueblo people. The Bald and Golden Eagle Protection Act therefore cannot be held to apply to Abeyta's killing of a golden eagle as an act of religious conviction.

## B. FREE EXERCISE OF RELIGION

■ Even if Abeyta were not a beneficiary of the Treaty of Guadalupe Hidalgo, this prosecution could not proceed without offending Abeyta's federally protected rights. It is clear that Abeyta's killing of a golden eagle was an act of religious belief. The government does not dispute Abeyta's assertion that he acted solely upon religious motivation and only for a religious purpose. There is no allegation that commercial or other secular intentions tainted his act. Abeyta's act therefore is protected by the first amendment to the United States Constitution. As constitutionally protected conduct, Abeyta's act may only be punished if the government demonstrates that such an application of the Bald and Golden Eagle Protection Act will ad-

vance a compelling governmental interest and that the act embodies the least restrictive means by which the government interest can be vindicated. *See United States v. Lee,* 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982); *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).

■ The government's interest in protection of golden eagles is certainly commendable and important, but the prosecution has not established that it is compelling. The golden eagle is not an endangered species. The uncontradicted testimony at trial established that some eagles could be taken without harmful impact on the remaining population. The government's conservation interests therefore are not compelling and cannot warrant a constriction of Indian religious liberty.

Even if the government's interest were compelling, however, it could achieve its ends by means less burdensome on the free expression of Indian religious faith. The evidence at trial established that the federal administrative apparatus erected to accommodate Indian religious needs is utterly offensive and ultimately ineffectual. The application process is cumbersome, intrusive and demonstrates a palpable insensitivity to Indian religious beliefs. Since some depradating golden eagles are taken by ranchers for non-religion purposes, it is plain that some birds *could* be made available for religious purposes.

## IV. CONCLUSION

This decision in no way declares an open season on the hunting, taking, possession, use, or sale of eagles or their feathers. These beautiful and noble birds are an important national symbol and are an ecological asset and an aesthetic pleasure belonging to all people. Congress has articulated an unequivocal federal policy protecting eagles from harm. This policy advances important conservation and cultural interests. This decision establishes only that Abeyta's taking solely for religious ceremonial use of a golden eagle upon aboriginal lands of

the Isleta Pueblo is a lawful and protected expression of religious liberty secured by the Treaty of Guadalupe Hidalgo and by the first amendment to the United States Constitution. The cultural and conservation goals adopted by Congress do not now warrant the unnecessary constriction of Abeyta's exercise of his religion.

The government's charge will be dismissed.