**UNITED STATES of America, Plaintiff,**

v.

**THIRTY EIGHT (38) GOLDEN EAGLES OR EAGLE PARTS, Defendants.**

**No. CV–R–83–474–ECR.**

United States District Court, D. Nevada.

Oct. 15, 1986.

5. See note 4.

Lamond R. Mills, U.S. Atty., by Shirley Smith, Asst. U.S. Atty., Reno, Nev., Jose A. Toro, U.S. Dept. of Justice, Washington, D.C., for plaintiff.

Lawrence J. Semenza, Reno, Nev., for defendants.

## ORDER

EDWARD C. REED, Jr., Chief Judge.

This is a forfeiture action which comes to this Court by way of a Report and Recommendation made by the United States Magistrate regarding the plaintiff's motion for summary judgment. In that Report and Recommendation, the Magistrate indicates that summary judgment for the plaintiff should be granted, and that these defendant eagles and eagle parts should be forfeited to the plaintiff. A brief review of the facts leading up to the present posture of this case is appropriate.

In January of 1982, the claimant, Adam Norwall, sold or exchanged two full golden eagle wings to agents of the United States Fish and Wildlife Service (FWS). In the months that followed, the claimant made several exchanges with these agents, such that all of the defendants in question in this proceeding were given to the agents in return for money. On May 4, 1982, the claimant was indicted for illegally selling and offering to sell eagle carcasses and eagle parts, in violation of the Eagle Protection Act, 16 U.S.C. § 668(a) (Supp. V 1975). This case was tried in February of 1983, and ended in a hung jury and mistrial. The claimant was not retried on these charges.

In December of 1983, however, the Field Solicitor for the Department of the Interior assessed a civil penalty of $15,000 against the claimant under the same sections and also under Section 22, Title 50 of the Code of Federal Regulations. In that same month, the plaintiff filed the action now before the Court, seeking forfeiture of the defendants under the provisions of 50 C.F.R. § 12.1 et seq.

The claimant has opposed this forfeiture, arguing that the seizure of these eagles and eagle parts under the Act was in violation of his rights to free exercise of religion as secured by the first amendment to the Constitution. In addition, the claimant contends the Act was created in violation of the American Indian Religious Freedom Act (AIRFA), 42 U.S.C. § 1996 (1978). Further, the claimant argues that his treaty rights as a member of the Red Lake bank of Chippewa Indians allows him the right to trade and possess eagles and eagle parts.

In April of 1985, the plaintiff moved for summary judgment, contending that all relevant issues of fact had been resolved in the earlier proceedings of the case. This motion was submitted to the U.S. Magistrate, who recommended that summary judgment be granted for the following reasons. Initially, the Magistrate found that the claimant did not have standing to challenge the statutes and regulations which call for the forfeiture of these eagles and eagle parts, in that he had failed to apply for a permit to possess these items under the same provisions. Further, the Magistrate found there to be no triable issue of fact regarding the claimant's free exercise claims, in that all of the factors enunciated in *Callahan v. Woods*, 736 F.2d 1269 (9th Cir.1984) had clearly been met. Finally, the Report and Recommendation found no AIRFA violation in the Act. For these reasons, the Magistrate found that no triable issue of fact existed, and that summary judgment was proper under Fed.R.Civ.P. 56(a). *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

DISCUSSION

The Eagle Protection Act states in relevant part that

[a]ll bald or golden eagles, or parts, nests, or eggs thereof, taken, possessed, sold, purchased, bartered, offered for sale, purchase or barter, transported, exported, or imported contrary to the provisions of this subchapter, or of any permit or regulation issued hereunder, and all guns, traps, nets and other equipment, vessels, vehicles, aircraft, and other means of bartering, offering for sale, purchase, or barter, transporting, exporting, or importing of any bird, or part, nest or egg thereof, in violation of this subchapter or of any permit or regulation issued hereunder shall be subject to forfeiture to the United States.

16 U.S.C. § 668(b) (Supp. V 1975). The plain language of the statute thus prohibits the private possession of these animals or of any part of them without permission. The regulations governing the issuance of permits to Indians for the possession of eagles for religious purposes are found at 50 C.F.R. § 22.22, and provide that such permits will be granted upon a showing of:

1) the species and number of eagles to be taken or acquired by gift or inheritance,

2) the state and local area where the taking is to be done, or from whom the birds are to be acquired,

3) the name of the tribe with which the applicant is associated,

4) the name of the tribal religious ceremonies for which the specimens are required,

5) certification from the Bureau of Indian Affairs that the applicant is an Indian,

6) certification from a duly authorized official of the religious group that the applicant is authorized to participate in such ceremonies.

50 C.F.R. § 22.22(a). The regulations further indicate that eagles or eagle parts possessed under such a permit shall not be transferred, except to be handed down from generation to generation in accordance with tribal or religious custom. 50 C.F.R. § 22.22(b)(1).

STANDING

In the present case, the claimant has freely admitted that he failed to apply for the relevant permits described above in order to possess and transfer the defendants legally. He argues that these provisions are facially unconstitutional in that they burden his free exercise of religion. In her consideration of the claimant's argument, the Magistrate concluded that the claimant lacks standing to challenge the constitutionality of these provisions, in that he had never personally applied for a permit, thereby failing to allege a personal stake in the outcome of this matter.

It appears, however, that the claimant has alleged a sufficiently personal stake in the outcome of this suit to have standing. The Ninth Circuit has recently enunciated a three-part test by which to measure cases for the requirement of standing. In *Rail-*

*way Labor Executive Ass'n v. Dole,* 760 F.2d 1021 (9th Cir.1985), a railroad labor organization and an individual railroad employee sued the Secretary of the Department of Transportation and the Administrator of the Federal Railroad Administration for injunctive and declaratory relief in order to force those agencies to enforce railroad statutes which mandate the assessment of penalties against railroads for safety violations. The court, examining the standing of the plaintiffs *sua sponte,* indicated that a plaintiff must first show a distinct and palpable injury to himself in order to be able to sue in federal court. *Id.* at 1023, *citing Warth v. Seldin,* 422 U.S. 490 at 501, 95 S.Ct. 2197 at 2206, 45 L.Ed.2d 343 (1975). Second, the court found that the plaintiff must demonstrate a fairly traceable causal connection between the injury and the defendant's conduct in order to bring the action. *Id., citing Duke Power Co. v. Carolina Study Group,* 438 U.S. 59, 72, 98 S.Ct. 2620, 2629, 57 L.Ed. 595 (1978). Finally, the court noted that there must be a substantial likelihood that the plaintiff's request will redress or prevent the alleged injury in order for the suit to lie. *Id., citing Duke Power, supra,* at 79, 98 S.Ct. at 2633.

In the present case, the Magistrate concluded that claimant has failed to allege a distinct and palpable injury to himself, the first factor under *Dole,* as he has failed to apply for exemption from the Eagle Protection Act through the accepted channels. In this sense, reasons the Magistrate, the only injury which he can allege is that of *other* Indians, who have gone through the entire process and have had their requests for eagles or parts denied or unreasonably delayed. If the claimant were attempting to assert solely the rights of the other Indians in this matter, the Magistrate's point would be well taken. In this case, however, that the claimant is attempting to establish that the entire Act and permit process is facially unconstitutional in that the mere existence of the regulations burdens his exercise rights unreasonably. Several United States Supreme Court decisions show that the claimant need not have attempted to comply with the regulations in order to challenge facial constitutionality.

In *Poulos v. New Hampshire,* 345 U.S. 395, 73 S.Ct. 760, 97 L.Ed.2d 1105 (1958), for example, the petitioner had applied for a permit to hold religious services in a city park, but the permit was refused him. The petitioner then held the services without the permit and was arrested. The state supreme court held that the petitioner's only avenue in which to challenge the constitutionality of this statute was a direct appeal from the denial of the permit. Petitioner could not challenge the constitutionality of the statute in an appeal from an arrest for violation of the permit statute, in that the statute was held to be constitutional on its face and not void for vagueness or overbreadth. Thus, the state court held that the petitioner had no standing to challenge the constitutionality of the statutes, in that he had failed to appeal from the original denial of the permit. *Id.* at 400, 73 S.Ct. at 763.

The Supreme Court agreed. Initially, it noted that "[t]he valid requirements of license are for the good of the applicants and the public." *Id.,* at 409, 73 S.Ct. at 768. The Court further recognized that this licensure requirement would cast a burden upon the exercise of free speech, but, "the expense and annoyance of litigation is a price citizens must pay for life in an orderly society where the rights of the First Amendment have a real and abiding meaning." *Id.* Moreover, the Court noted that the state's procedure whereby the frustrated applicant was able to seek redress through normal judicial process comported completely with due process. *Id.* Therefore, the Court concluded, a permit statute, if valid on its face, may not be ignored, even if it has been invalidly applied. *Id., see Cantwell v. Connecticut,* 310 U.S. 296, 307, 60 S.Ct. 900, 904, 84 L.Ed. 1213 (1939) (wherein the Court allowed a challenge to a facially invalid statute where the defendant had failed to comply with the permit process). *Secretary of State of Maryland v. J.H. Munson Co.,* 467 U.S. 947, 965, 104 S.Ct. 2839, 2851, 81

L.Ed.2d 786 (1983); *City Council v. Taxpayers for Vincent*, 466 U.S. 789, 799, 104 S.Ct. 2118, 2125, 80 L.Ed.2d 772 (1983); *see also L. Tribe, American Constitutional Law*, § 12–32, at 727 (1978).

▮ In the present case, it is clear that the claimant has met the first plank of the *Dole* test, in that he has alleged that this entire scheme of licensure for the possession of eagle parts for religious purposes is unconstitutional. Initially, the claimant has argued in his answer to the complaint and in his opposition to the plaintiff's motion for summary judgment that the mere existence of the Eagle Protection Act constitutes a violation of the free exercise clause, in that it forces all Indians to comply with a regulatory scheme in order to practice their religion. Moreover, the claimant also asserts that the Act violates the treaty with his tribe, the Red Lake band of the Chippewa Indians. In this sense, it is clear that the claimant challenges not the manner in which the Act is administered, but the mere existence of the Act itself. The challenge, therefore, is to the facial validity of the Act, and claimant need not have complied with the permit process in order to raise such a challenge.

▮ The other portions of the *Dole* test also appear to have been satisfied in this case. First, there is a traceable connection between the defendant's alleged injury and the plaintiff's conduct in this case, in that the plaintiff admits having confiscated the eagle parts under the allegedly unconstitutional statute. Additionally, there is a substantial likelihood that the claimant's requested relief will redress the injury complained of in this case, in that a finding that the Act is unconstitutional would force a return of the defendants to the claimant and would prevent all such future confiscations. In that all of the *Dole* factors are satisfied in this action, therefore, the claimant does have standing to challenge the Government action under these statutes, and this Court must consider the merits of the case. It should be noted, however, that claimant has standing to challenge only the *facial* validity of the Eagle Protection Act,

and not the manner in which the Act is administered. In order to challenge the administration of the Act, claimant would have first had to apply for a permit, which he has failed to do.

## FREE EXERCISE CLAIMS

The claimant contends that the Act unreasonably burdens his free exercise of his religion, in that it makes the possession and procurement of eagles and eagle parts very difficult. The Magistrate, however, applying the standards enunciated in *Callahan v. Woods*, 736 F.2d 1269 (9th Cir. 1984) found that the regulatory scheme presented by the Eagle Protection Act posed no free exercise problem. In support of the Magistrate's finding, the plaintiff cites *United States v. Top Sky*, 547 F.2d 486 (9th Cir.1976), arguing that the Ninth Circuit in this case has already held the Eagle Protection Act constitutional. Whereas the Ninth Circuit did find part of the Act constitutional in *Top Sky*, it did not discuss the parts relevant to this proceeding.

In *Top Sky*, the defendants were charged with violating the *criminal* sanctions of the Eagle Protection Act, 16 U.S.C. 668(a) (Supp. V 1975). In the early months of 1974, the defendants had been contacted by two federal agents, who were posing as representatives of a down and feather company. The agents, who were not Indians, told the defendants that they wished to purchase eagle feathers for resale to East coast collectors. *Id.*, at 487. After the sales were consummated, the defendants were arrested and charged with the violation of the Act.

In response to these charges, the defendants argued that their criminal prosecution under the Act constituted a violation of their free exercise clause rights. The Ninth Circuit rejected this contention for several reasons. First, the court noted that the prosecution was for " 'selling' eagle parts, which is not only not a part of the Indian religion, but the act of selling is deplored by the Indian religion." *Id.*, at 488. In that the prosecution was for the

simple commercial act of selling feathers, the court noted, the prosecution imposed no possible burden upon the defendants' free exercise of religion. *Id.* Further, the court noted, the defendants lacked standing to assert free exercise clause violations. Although the court's opinion is less than clear on the point, it appears that the defendants lacked standing to challenge the constitutionality of the Act in that they were prosecuted for the commercial act of selling feathers, and could assert no possible free exercise claims. Therefore, the only rights which the defendants could assert would be the rights of other Indians who had legitimate complaints against the Act, which was insufficient for standing in this case. *Id.,* at 489 *citing McGowan v. Maryland,* 366 U.S. 420, 429, 81 S.Ct. 1101, 1106, 6 L.Ed.2d 393 (1961); *Barrows v. Jackson,* 346 U.S. 249, 255, 73 S.Ct. 1031, 1034, 97 L.Ed.2d 1586 (1953).

The present case is distinguishable from *Top Sky* for three reasons. Initially, although the plaintiff has argued that the claimant in this case was merely selling the eagle feathers for a profit, the claimant's affidavits indicate that he was exchanging the eagle feathers and parts in accordance with Indian custom. This factual dispute itself indicates that the *Top Sky* case does not control this case entirely. In addition, however, the defendants in *Top Sky* were being prosecuted under the *criminal* portions of the Act, whereas the claimant here is merely seeking to recover property confiscated under the civil portions of the Act. Whereas the two portions of the statute are similar, they are by no means identical, and contain different standards. *Compare* 16 U.S.C. § 668(a) *with* 16 U.S.C. § 668(b), *and* 50 C.F.R. 22 *et seq.* Finally, the court in *Top Sky* held that the defendants in that case had no standing to challenge the Act on constitutional grounds, in that they were merely asserting the rights of other Indians. In this case, it is clear that the claimant is challenging the facial constitutionality of the Act, and therefore has standing to attack it.

In that *Top Sky* is not applicable to this case, the Eagle Protection Act and its enabling regulation must be measured against the applicable free exercise test. In *Callahan v. Woods, supra* the Ninth Circuit adopted a three-part test by which to gauge laws for possible free exercise violations. In this case, the plaintiff had sought to receive Aid to Families with Dependent Children benefits without obtaining a social security number for his infant daughter. The plaintiff had failed to procure the identification number for his child out of a sincere religious belief that universal numbers are the "mark of the beast" by means of which the Antichrist endeavors to control mankind. *Id.* at 1271. The district court had granted summary judgment against the plaintiff, in that the court found the government's compelling interest in having AFDC recipients classified by number to outweigh the religious belief, and that the numeric system was the least restrictive means for accomplishing the government's goal of administering the program effectively.

The Ninth Circuit reversed the order granting summary judgment. Initially, the court noted that in determining whether a neutrally based statute violates free exercise clause, the court must first consider the magnitude of the statute's impact on the exercise of religious belief. *Id.,* at 1273. In this case, the court determined that the numbering system required by the AFDC program did have great impact on the exercise of the plaintiff's religious beliefs, for the plaintiff was forced into choosing between accepting the benefits and compromising a sincerely held religious belief. *Id., citing Stevens v. Berger,* 428 F.Supp. 896 (E.D.N.Y.1977); *and Mullaney v. Woods,* 97 Cal.App.3d 710, 158 Cal. Rptr. 902 (1979).

Second, the court noted, a district court must also consider the existence of a compelling state interest which justifies the burden imposed upon the religious belief. In this regard, the court found it useful to look first at the importance of the value underlying the regulation, and then to examine the proximity and necessity which the chosen manner of regulation bears to

the underlying value. *Id.*, at 1274, *citing* Giannella, *Religious Liberty, Nonestablishment, and Doctrinal Development*, 80 Harv.L.Rev. 1381, 1390 (1967). The value of the AFDC program is undeniably important, found the court, in that in its assistance was intended to strengthen family life and to help families attain maximum self-support and personal independence. *Id.*, *citing United States v. Lee*, 455 U.S. 252, 258, 102 S.Ct. 1051, 1055, 71 L.Ed.2d 127 (1982). In addition, the court also found the proximity and necessity of the challenged regulation to that value indisputable. The social security numbering system was essential for the efficient operation of the AFDC system, the court found, in that the numbering system was by far the most cost effective means of administering the program. *Id.* Therefore, the court concluded, the government had promoted a compelling governmental interest in using the social security numbering system. *Id.*

Finally, the court noted that a court must also consider the extent to which the recognition of an exemption from the statute would impede the objectives sought to be advanced by the statute. *Id.*, at 1273. Here, the court found that the affidavits submitted with the summary judgment motion failed to address the potential cost of exempting one person from the numbering requirement. The evidence did indicate the cost of converting to a completely non-numbered system, but there was no evidence that "the exemption of one person from the number requirement would mandate the development of an entire non-numerical system." *Id.*, at 1274. Therefore, without evidence of the cost of an exemption from the statute, the court found that the district court had failed to consider the most critical inquiry of the three-part test. The case was thus reversed and remanded.

In the present case, the Magistrate has concluded that the Government has satisfied all three of the *Callahan* factors. Initially, the Magistrate found that the Act and its enabling regulations have not had an impact on the claimant's free exercise of his religion, in that "the claimant has chosen to forego the permit process entirely."

Magistrate's Report and Recommendation, at p. 6. Therefore, she concluded that the Eagle Protection Act may have interfered with the claimant's free exercise rights incidentally, but that the "claimant's free exercise rights were not otherwise effected [sic]." *Id.*

■ The Magistrate's recommendation on this point is incorrect. As stated before, the claimant has challenged the facial validity of the Act, not the administrative operation of the Act. Therefore, the fact that the claimant has chosen to forego the administrative procedure for procurement of the eagle parts is not relevant. Further, it appears that the Eagle Protection Act has had a profound impact on the exercise of the Indian religion in general. As the claimant's affidavits demonstrate, experts in comparative religion have likened the status of the eagle feather in Indian religion to that of the cross in the Christian faith. In that the eagle feather enjoys such an exalted status in the Indian religion, *any* scheme which limits the access of the faithful to their talisman must be seen as having a profound effect on the exercise of religious belief. *See United States v. Abeyta*, 632 F.Supp. 1301, 1304 (D.N.M. 1986). This is not to say that this effect on the Indian religion is necessarily unconstitutional, as this part of the *Callahan* test merely requires an assessment of the *magnitude* of the effect on religion. In this case, the effect of the Act on the Indian religion is significant.

Next, the Magistrate has concluded that a compelling interest exists in the protection of eagles, which is the primary purpose of the Eagle Protection Act. The claimant does not dispute this point. For the purposes of analysis, however, the Court notes that the value which the Eagle Protection Act serves to protect is of great importance, in that both the bald and golden eagle are species whose existence is threatened. *See* Senate Rep. No. 1159, 92nd Cong., 2nd Sess., *reprinted in* 1972 U.S.Code Cong. & Ad.News 4285, 4286–88. In addition, the regulations contained in the

United States Code and the Code of Federal Regulations are clearly proximately and necessarily related to the protection of these threatened species, as they purport to prevent the unnecessary destruction of these rare birds. *Id.* Therefore, the government has sought to further a compelling interest in promulgating these regulations.

 In this case, as with most free exercise problems, application of the last clause of the *Callahan* test is the most problematic. The Magistrate found that "the Congress' objectives would be impeded by an exemption to the statute whereby Indians could possess and exchange eagle parts for religious purposes without a permit." Magistrate's Report and Recommendation, at p. 7. This assessment appears to be correct. Although the regulatory scheme admittedly *interferes* with the exercise of Indian religion, it must be remembered that existence of rare and endangered species is at stake. In *Callahan*, the cost of exempting one individual from the numbering system had not been shown by the government, and actually appeared, in common sense, to be fairly slight. In this case, however, the cost of exempting all Indians from the regulatory procedures would be disastrous to the eagles, in that their numbers could be severely reduced. H.R.Rep. No. 1450 87th Cong., 2nd Sess., (1962). In addition, the regulatory scheme itself already contains a procedure by which any Indian may apply to the Government for a permit to take or possess eagles or their parts. *See* 50 C.F.R. § 22, *et seq.* Although the claimant argues that this permit procedure also is violative of the free exercise clause, one must remember that the claimant has no standing to challenge the alleged imperfections of the permit process, in that he has never applied for such a permit. In this proceeding, the claimant only has standing to challenge the facial validity of the Eagle Protection Act, and this Court finds that the Act meets the requirements set forth in *Callahan.*

It must be noted that cases from other district courts have reached the opposite conclusion. In *United States v. Abeyta,* 632 F.Supp. 1301 (D.N.M.1986), for example, the defendant was charged with violating the criminal provisions of the Eagle Protection Act. *Id.*, at 1303; *see* 16 U.S.C. § 668(a). The defendant had apparently killed a golden eagle upon reservation grounds, and had kept the carcass and feathers for use in his religious ceremonies. His sole purpose in killing the bird was to use its feathers in this religious ceremony. He had, however, failed to secure a permit to take the eagle as required by the Act and the enabling regulations, for which he was prosecuted. In his defense, the claimant argued that the killing of the bird and the possession of its feathers was an act of religious belief, and was therefore protected by the free exercise clause of the Constitution.

The United States District Court for the District of New Mexico agreed with the defendant's argument. Initially, it noted that the government's interest in protecting the golden eagle was "commendable and important," but that the prosecution had failed to show that it was compelling. *Id.*, at 1307. The uncontradicted testimony at that trial indicated that some eagles could be taken without harmful impact on the remaining population. *Id.* Thus, the court concluded, the conservation interests of the government were simply not compelling enough to warrant the burdens imposed upon Indian religion by the Act.

Moreover, the court noted that the government could have achieved its desired ends by a less burdensome means than provided by the Act. In this case, the evidence presented at trial showed that the "federal administrative apparatus erected to accommodate Indian religions is utterly offensive and ultimately ineffectual." *Id.* Therefore, the court noted that the Act itself was not only facially unconstitutional, but that the regulations were being administered in a manner that violated the free exercise clause as well. *Id.*

This case, like *Top Sky,* is distinguishable from the present for several reasons. Initially, the court in *Abeyta* discussed the

facial unconstitutionality of only the criminal portions of the Eagle Protection Act. Nowhere did the case mention the civil provisions of the Act, which are at issue here. In addition, in contrast to the evidence presented to the court in *Abeyta,* the affidavits presented to this Court in the motion for and the opposition to summary judgment indicate that the government has a compelling interest in protecting these rare species of birds. Indeed, the claimant has admitted as much in his opposition and in his objections to the Magistrate's Report and Recommendation. Moreover, the *Abeyta* case was decided in the Tenth Circuit, and the court there was not bound to apply the *Callahan* test as is this Court. If the *Abeyta* court had applied the *Callahan* test, it would have been forced to grapple with the problem of whether the Congressional objective in the Eagle Protection Act would be impeded by the creation of an exception to the statute. It is quite possible that the court in New Mexico would reach the same conclusion as this Court has, if it had been required to apply the same free exercise test.

Additionally, the *Abeyta* court considered the constitutionality of the Act as carried out by the administrative regulations promulgated in 50 C.F.R. § 22, *et seq.* With all due respect to that court, it was in error in deciding that issue. In *Abeyta,* as in this case, the defendant had completely neglected to apply for a permit to take or possess an eagle or any of its parts as provided by the regulations. Because of this failure, the defendant in *Abeyta,* as in this case, lacked standing to contest the validity of the regulations as applied. *See* discussion of standing, *supra,* at pg. 5–10. Therefore, the *Abeyta* court's constitutional determination regarding the regulatory scheme of the Eagle Protection Act must be disregarded, in that the defendant in that case, as here, lacked standing to make such a challenge. Therefore, the *Abeyta* case is without conclusive or persuasive effect in the present case, and will be disregarded by this Court.

## AIRFA VIOLATIONS

The claimant further asserts that the Eagle Protection Act was enacted in violation of the American Indian Religious Freedom Act, or AIRFA. The Act provides that

> ... it shall be the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian ... including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites.

42 U.S.C. § 1996 (1978). In that the Eagle Protection Act deprives him of his use and possession of sacred objects, contends the claimant, the Act stands in violation of the AIRFA.

In her Report and Recommendation, the Magistrate has rejected this contention, and the relevant case law bears out this assessment. Initially, it appears that there may be no private cause of action created by the AIRFA. In *Crow v. Gullet,* 541 F.Supp. 785 (D.S.D.1982), *aff'd* 706 F.2d 856 (8th Cir.1983) *cert. denied* 464 U.S. 977, 104 S.Ct. 413, 78 L.Ed.2d 351 (1983), for example, a group of leaders from the Lakota and Tsistsistas Nations brought an action to enjoin the State of South Dakota's actions in restricting access to the sites of traditional religious ceremonies. In addition to a claim under the first amendment, the plaintiffs also sought relief independently under AIRFA. The defendants, however, argued that the AIRFA was merely a statement of congressional policy, and was not intended to create any independent rights. *Id.,* at 793.

The court agreed with the defendant in this case. The Act, noted the court,

> was meant to insure that American Indians were given the protection that they are guaranteed under the First Amendment; it was not meant to in any way grant them rights in excess of those guarantees.... The Act does not require that access to all publicly owned properties be provided to the Indians

without consideration for other uses or activities, nor does it require that native traditional religious considerations always prevail to the exclusion of all else. *Id.*, at 794–94, *quoting Hopi Indian Tribe v. Block*, 8 ILR 3073 (D.D.C.1981) *aff'd sub nom Wilson v. Block*, 708 F.2d 735 (D.C. Cir.1983) *cert. denied* 464 U.S. 956, 104 S.Ct. 371, 78 L.Ed.2d 330 (1983); *see also* H.R.Rep. No. 1308, 95th Cong. 2nd Sess., *reprinted in* 1978 U.S. Code Cong. & Ad. News 1262. Therefore, the court concluded that the AIRFA required no more from the defendants than adherence to the standards enunciated in the first amendment to the Constitution. *Id.*

The existence of a private cause of action under AIRFA is also doubtful, in that such a private right could pose formidable establishment of religion problems. Under the standards enunciated in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), this private action could be found to have a primary purpose of advancing the Indian religion, a primary effect of benefitting that religion, and could involve an excessive entanglement of the state and religion. *Id.*, at 612, 91 S.Ct. at 2111; *see* L. Tribe, *American Constitutional Law*, § 14–12, at p. 869 (1978). Although the Court does not decide this issue here, it does note that there are serious difficulties with the concept of a private cause of action under AIRFA.

Even if a private action may validly exist under the Act, it is clear that the claimant in this case has failed to allege the facts sufficient to avoid summary judgment on the issue. In *Wilson v. Block*, 708 F.2d 735 (D.C.Cir.1983) *cert. denied* 464 U.S. 956, 104 S.Ct. 371, 78 L.Ed.2d 330 (1983), for example, a group of Arizona Indian tribes sought to enjoin the Forest Service and the Department of Agriculture from granting private permits to expand and develop the government owned ski areas on the San Francisco Peaks in the Coconino National Forest. These peaks, contended the Indians, have played a central role in the religious rites of the tribes for generations, in that they are believed to be the homes of specific deities for various parts of the year. Both the Hopi and Navajo peoples worship at various sites on the peaks, and collect a variety of sacred objects there, including herbs, plants, and animals. In that the use of the peaks by the private interests substantially interfered with these tribes' free exercise rights, they argued that the grant of the permit was also in violation of the AIRFA. *Id.*, at 739.

The District of Columbia Court of Appeals found that the peaks were indispensible to the Indians' religion, but that there was no interference with their access to them so as to reach constitutional levels. *Id.*, at 745. Further, the court found that there had been no violation of the AIRFA. Initially, the court noted that the purpose of AIRFA is "to insure that the policies and procedures of various federal agencies, as they may impact [sic] upon the exercise of traditional Indian religious practices, are brought into compliance with the constitutional injunction that Congress shall make no laws abridging the free exercise of religion." *Id.*, at 746, *citing* H.R.Rep. No. 1308 95th Cong., 2nd Sess. 2–3, *reprinted in* 1978 U.S.Code Cong. & Ad.News 1262, 1263–1264. Thus, the court found, the AIRFA requires federal agencies to learn about traditional Indian religions so as to avoid unnecessary interference with them. Agencies are required under the Act to "evaluate their policies and procedures in light of the Act's purpose, and ordinarily should consult Indian leaders before approving a project likely to affect religious practices." *Id.*

The court did note, however, that the Act does not place Indian religion in an exalted position. This Act merely insures that the federal government treats Indian religions on an equal footing with all others. *Id.* As the court concluded, "AIRFA requires federal agencies to consider, but not necessarily to defer to, Indian religious values." *Id.*, at 747. In this case, the court found that the agencies approving the lease had complied with the AIRFA, in that they had held many meetings with the Indian religious practitioners and tribes to be affect-

ed by the transfer. In that the interests of the Indians had been given due consideration, the court found that no violation of the Act had occurred.

■ In the present case, the claimant has presented no evidence in his affidavits which indicate that the federal government has violated the AIRFA in enacting the Eagle Protection Act. If there were some evidence beyond mere conclusion that the Act had been created in complete disregard for Indian religious values, perhaps the claimant could state a cause of action. (Even this point is questionable, however, in view of the fact that there may be no private cause of action under AIRFA. *See Crow, supra.*) Therefore, there is simply no genuine issue of material fact presented by the claimant on this point, and summary judgment is proper. *See United States v. Dion,* 762 F.2d 674 (8th Cir.1985) (where evidence showed that defendant killed eagles for profit and not for religious purposes, no AIRFA claim could be asserted), *cert. granted,* —— U.S. ——, 106 S.Ct. 270, 88 L.Ed.2d 225 (1986).

## TREATY VIOLATIONS

Claimant lastly contends that the seizure of these eagles and eagle parts from him under the Act is forbidden by the treaty between his tribe, the Red Lake Band of the Chippewa, and the United States. The Magistrate's Report and Recommendation does not address this point. Applicable case law from the Ninth Circuit, however, does address the issue on point.

In *United States v. Fryberg,* 622 F.2d 1010 (9th Cir.1980), *cert. denied* 449 U.S. 1004, 101 S.Ct. 545, 66 L.Ed.2d 301 (1980), the defendant, an enrolled member of the Tulalip Tribe in the State of Washington, was prosecuted for killing an immature bald eagle on the reservation. *Id.,* at 1011. In response to this prosecution, the defendant argued that he had killed the bird solely for religious purposes, and that he, as a member of the Tulalip Tribe, had a right secured by treaty to hunt and kill eagles on the reservation. The treaty provided in pertinent part that:

> [t]he right of taking fish at usual and accustomed grounds and stations is further secured to said Indians in common with all citizens of the Territory ... together with the privilege of hunting and gathering roots and berries on open and unclaimed land.

Treaty of Point Elliot, 12 Stat. 927 (1859). *See Fryberg, supra,* at 1011. The language of this treaty, argued the defendant, secured his right to take the bird. These rights, the defendant further argued, were not amended by the Eagle Protection Act under which this prosecution occurred.

The Ninth disagreed with the defendant's argument. After citing the relevant case law, the court concluded that

> "reasonable conservation statutes affect Indian treaty rights when (1) the sovereign exercising its police power to conserve a resource has jurisdiction in the area where the activity occurs; (2) the statute applies in a non-discriminatory manner to both treaty and non-treaty persons; and (3) the application of the statute to treaty rights is necessary to achieve its conservation purpose."

*Id.,* at 1015.

The court in this found that the Eagle Protection Act satisfied all these criteria. Initially, it noted that the United States had the jurisdiction to exercise its police power in this area, in that Indian reservations are within the jurisdiction of the United States. *Id.* Further, the court found that Act to be non-discriminatory, in that all persons in the United States are equally bound by the language of the Act. Finally, noted the court, it was clear that the application of the statute to treaty rights was necessary to achieve the goal of the Act, in that Congress intended to ban all threats to the survival of the bald eagle in enacting of the legislation. *Id., citing* H.R.Rep. No. 2104, 76th Cong., 3rd Sess. 1 (1940). Thus, the court concluded that the Eagle Protection Act had legitimately limited the treaty rights of the defendant. *See United States v. Eberhardt,* 789 F.2d 1354 (9th Cir.1986).

As in *Fryberg*, the Eagle Protection Act has limited any possible treaty right which the claimant could assert in this case. Even assuming that *Fryberg* does not control here, however, it does not appear to the Court that the claimant even holds a treaty right to take or possess eagles. The United States' treaty with the Red Lake band of the Chippewa allows the Indians to hunt, fish, and gather wild rice upon the lands, rivers and lakes which the Chippewa ceded to the United States. Treaty with the Chippewa, 7 Stat. 536 (1837). The lands ceded by the Chippewa in this treaty appear to have been located in present day Minnesota and Wisconsin. Thus, even if the claimant has a right to hunt eagles and possess their body parts, that right would be limited to the lands ceded in the treaty. In the present case, the claimant has made no aversion of fact that these eagle parts were taken on those lands. Indeed, the claimant has admitted that he procured them all over the United States and in Canada. Therefore, even if *Fryberg* did not dispose of the question generally, the claimant still has no cognizable treaty right in the eagles or eagle parts.

In that the claimant has not presented this Court with any evidence which indicates the existence of a genuine issue of material fact, summary judgment in this case is proper. *United States v. One 1980 Mercedes Benz 500 SE*, 772 F.2d 602, 604 (9th Cir.1985) *citing United States v. One 1977 Mercedes Benz*, 708 F.2d 444, 447 (9th Cir.1983) *cert. denied* 464 U.S. 1071, 104 S.Ct. 981, 79 L.Ed. 217 (1983).

IT IS, THEREFORE, HEREBY ORDERED for the reasons described above, that the Magistrate's conclusion in her Report and Recommendation on the plaintiff's motion for summary judgment is AFFIRMED.

IT IS FURTHER ORDERED that the plaintiff's motion for summary judgment is GRANTED, and the Clerk shall enter judgment for the plaintiff accordingly, whereby the defendants shall be forfeited to the United States.