**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Dean R. FRYBERG,**
**Defendant-Appellant.**

No. 79–1488.

United States Court of Appeals,
Ninth Circuit.

July 7, 1980.

John W. Tapp, Asst. Federal Public Defender, Seattle, Wash., for defendant-appellant.

Stephen C. Schroeder, Seattle, Wash., for plaintiff-appellee.

Before DUNIWAY and WALLACE, Circuit Judges, and JAMESON,* District Judge.

JAMESON, District Judge:

Dean Raymond Fryberg was charged by information with the unlawful taking, shooting and killing of a bald eagle, in

---

* The Honorable William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation.

violation of 16 U.S.C. § 668 and 668c.[1] He moved to dismiss the information on the grounds that "§ 668 *et seq.* cannot apply to the taking of an eagle for North American ceremonial and religious purposes", a right secured to him by treaty, and that the prosecution constitutes a violation of the "free exercise" clause of the First Amendment to the Constitution of the United States. Following a combined evidentiary hearing and trial the district court denied the motion to dismiss and found the defendant guilty. We affirm.

Fryberg is an enrolled member of the Tulalip Indian Tribe. It is conceded that he has a treaty right to hunt on the Tulalip Reservation under the Treaty of Point Elliot, 12 Stat. 927 (1859).[2] While deer hunting on the reservation, Fryberg shot and killed an immature bald eagle, which was perched in a tree located within reservation boundaries. He did not possess a permit which would allow a taking pursuant to 16 U.S.C. § 668a.[3]

At the hearing in district court Fryberg claimed that his purpose in shooting the eagle was to obtain its feathers and other parts to decorate Indian ceremonial objects for use in organized tribal religious and cultural ceremonies. After hearing conflicting testimony, however, the district court found that the killing of the eagle was not for religious ceremonial purposes.[4] The court concluded that (1) even if a religious purpose did underlie the killing of the eagle, prosecution under § 668 did not abridge Fryberg's religious rights; and (2) that § 668 and its several amendments

clearly show a Congressional intent that the prohibition against killing bald eagles include Indians who enjoy a general treaty right to hunt on their reservation.

█ The sole issue presented on this appeal is whether the Eagle Protection Act, 16 U.S.C. § 668 *et seq.*, modified or abrogated treaty hunting rights to prohibit the taking and killing of bald eagles.

§ 668(a) provides in pertinent part:

Whoever, within the United States or any place subject to the jurisdiction thereof, without being permitted to do so as provided in sections 668 to 668d of this title, shall knowingly, or with wanton disregard for the consequences of his act take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport, export or import, at any time or in any manner, any bald eagle, commonly known as the American eagle, or any golden eagle, alive or dead, or any part, nest, or egg thereof of the foregoing eagles, or whoever violates any permit or regulation issued pursuant to sections 668 to 668d of this title, shall be fined not more than $5,000 or imprisoned not more than one year or both; . . .[5]

In contending that his treaty rights to hunt on the reservation were not abrogated or modified by the Eagle Protection Act, appellant relies upon *United States v. White*, 508 F.2d 453 (8 Cir. 1974), where the court under facts similar to those present here held that the Eagle Protection Act did not affect the hunting rights of the Red Lake Chippewa Indians recognized in treaties negotiated with the United States.

1. Pertinent portions of the Act, referred to as the Eagle Protection Act, are set forth in the text of this opinion, *infra.*

2. Article V of the treaty provides:
The right of taking fish at usual and accustomed grounds and stations is further secured to said Indians in common with all citizens of the Territory . . . together with the privilege of hunting and gathering roots and berries on open and unclaimed land.

3. § 668a grants the Secretary of the Interior authority to permit the "taking, possession, and transportation of specimens" for specifically listed purposes. An amendment adopted in

1962 includes "the religious purposes of Indian tribes". Before issuing a permit the Secretary must conduct an investigation and determine that the use "is compatible with the preservation of the bald eagle or the golden eagle. . . ."

4. Fryberg does not contest this finding.

5. Golden eagles were placed under the protection of the Act by a 1962 amendment. The Act was further amended in 1972 to increase the punishment and decrease the degree of knowledge required for conviction.

The court concluded that to affect those rights "it was incumbent upon Congress to expressly abrogate or modify the spirit of the relationship between the United States and Red Lake Chippewa Indians on their native reservation;" and that Congress had not done so. *Id.* at 457–458. The court noted that its conclusion was in accord with *United States v. Cutler,* 37 F.Supp. 724 (D.Idaho 1941), where the court held that a treaty Indian was not subject to the Migratory Bird Act. The *White* court concluded also that § 668(a) lacked the specificity required of criminal statutes as applied to an Indian on an Indian reservation.

In a dissenting opinion Judge Lay concluded that in enacting the Eagle Protection Act and subsequent amendments, "Congress obviously recognized the dire need for legislation and realized that conservation can be accomplished only by the enactment of a law which applies to *all* persons, prior treaties notwithstanding." *Id.* at 462. He said in part:

> The majority here, however, limits their analysis of § 668 to the fact that there is no express reference, either within § 668 or its legislative history, to modification of the defendant's treaty right to hunt eagles. Overlooked is the broad wording and the pervasive purpose which the act is intended to fulfill—the protection of the bald and golden eagles.

*Id.* at 459.

In *United States v. Allard,* 397 F.Supp. 429 (D.Mont.1975), the court agreed with the dissent in *White,* stating that Judge Lay's opinion "demonstrates that Congress (by making special provisions for Indian permits to take bald and golden eagles) did have Indians in mind; that Congress was gravely concerned with the threat that these magnificent birds might disappear from North America; and that it intended the prohibition to apply to all persons regardless of treaties." *Id.* at 431.[6]

The defendant in *United States v. Allard* and others similarly situated brought suit for declaratory and injunctive relief in the District Court for the District of Colorado. The issue in the Colorado court was limited to whether the parties could be prosecuted for selling eagle products taken prior to the Act's enactment in 1940 (i. e. it did not involve Indian treaty rights).[7] A three-judge court held that the Eagle Protection Act and the Migratory Bird Treaty Act did not apply "to preexisting, legally obtained bird parts or products therefrom".

The Supreme Court reversed. In *Andrus v. Allard,* 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979), the Court noted that the "Eagle Protection Act and the Migratory Bird Treaty Act are conservation statutes designed to prevent the destruction of certain species of birds" and held that both acts were applicable to "pre-act bird products", except with respect to their "possession or transportation". The Court was not presented with the treaty abrogation issue, but it notably construed the provisions of the Act broadly and the exceptions narrowly to achieve the conservation purpose of the Act. In concluding that eagle artifacts in existence prior to passage of the Act were subject to its prohibitions despite the absence of express language indicating a retroactive effect, the Court said:

> In view of the exhaustive and careful enumeration of forbidden acts in § 668(a), the narrow limitation of the proviso to "possession or transportation" compels the conclusion that, with respect to pre-existing artifacts, Congress specifically declined to except any activity other than *possession* and *transportation* from the general statutory ban. To read a further exemption for pre-existing artifacts into

---

**6.** While *Allard* involved the *sale* of eagle feathers and on that basis is distinguishable, the court held that "if this case should involve treaty hunting rights, those rights as to eagles were abrogated." *Id.* at 431.

**7.** The plaintiffs attacked the validity of regulations promulgated by the Secretary of the Inte-

rior prohibiting commercial transactions in parts of birds legally killed before they came under the protection of the Act. The Eagle Protection Act contained a proviso that its prohibition did not apply to "possession or transportation" of eagles or parts taken before the effective date of the Act.

the Eagle Act, "we would be forced to ignore the ordinary meaning of plain language." *TVA v. Hill,* 437 U.S. 153, 173 [, 98 S.Ct. 2279, 2291, 57 L.Ed.2d 117] (1978).

100 S.Ct. at 322.

In *United States v. Top Sky,* 547 F.2d 486 (9 Cir. 1976), the defendant had been convicted of selling golden eagles and golden eagle feathers in violation of the Eagle Protection Act. In affirming the conviction this court held that the sale of eagle parts was beyond the scope of a treaty giving reservation Indians the right to hunt. It was not accordingly necessary to consider whether the Act modified or abrogated treaty hunting rights. We noted that our holding was not inconsistent with *United States v. White, supra,* and stated:

> We wish to avoid any suggestion that we agree or disagree with the *White* majority on the issue of treaty abrogation. The Eighth Circuit was divided; Judge Lay's dissent is a substantial one. We leave the question entirely open until it is necessary to decide it.

547 F.2d at 488, n. 4. It is now necessary to decide the question reserved in *Top Sky.*

As we recognized in *Top Sky,* the Eagle Protection Act "is a federal statute of general applicability making actions criminal wherever and by whomever committed". We quoted from *United States v. Burns,* 529 F.2d 114, 117 (9 Cir. 1976): "Such laws are applicable to the Indian unless there exists some treaty right which exempts the Indian from the operation of the particular statutes in question." 547 F.2d at 488.

Both the majority and dissenting opinions in *White* recognize that "the intention to abrogate or modify a treatment is not to be lightly imputed to the Congress," *Menominee Tribe v. United States,* 391 U.S. 404, 412–13, 88 S.Ct. 1705, 1711, 20 L.Ed.2d 697 (1968). It is true, as the majority concludes in *White,* that neither the Act's statutory language nor its legislative history *expressly* state that Indian treaty rights were to be abrogated. The *White* majority recognized that Congress in 1962 amended 16 U.S.C. § 668a to permit the Secretary of the Inte-

rior to authorize use of bald and golden eagles "for the religious purposes of Indian tribes". Although a reasonable implication of this amendment is that Indians are otherwise subject to the Act, we agree with *White* that this language in itself does not show an unambiguous express intent to abrogate Indian treaty hunting rights.

It is not necessary, however, that Congressional determination to abrogate or modify treaty rights be expressed on the "face of the Act". We recognize that "Absent explicit statutory language, [the court must be] extremely reluctant to find congressional abrogation of treaty rights, *e. g., Menominee Tribes v. United States,* 391 U.S. 404 [, 88 S.Ct. 1705, 20 L.Ed.2d 697], . . .", *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 99 S.Ct. 3055, 3077, 61 L.Ed.2d 823 (1979). This language requires careful consideration of the facts and circumstances of each case. But even in cases involving total termination or diminishment of a reservation, Congressional intent may be "clear from surrounding circumstances and legislative history", despite the absence of a Congressional expression on the "face of the Act" to abrogate or modify treaty rights. See *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 588, n. 4, 97 S.Ct. 1361, 1364, n. 4, 51 L.Ed.2d 660 (1976). "In all cases, the 'face of the Act', the 'surrounding circumstances', and the 'legislative history', are to be examined with an eye towards determining what Congressional intent was." [Citing *Mattz v. Arnett,* 412 U.S. 481, 505, 93 S.Ct. 2245, 2258, 37 L.Ed.2d 92 (1973)]. *Id.* 430 U.S. at 587, 97 S.Ct. at 1363.

In *Menominee, supra,* the issue was whether the Menominee Indian Termination Act of 1954, 25 U.S.C. §§ 891–902, totally extinguished Indian hunting and fishing rights. Destruction of these substantial rights would subject the United States to a claim for compensation. Moreover, the Court found the purpose of the Act was to "provide for the orderly termination of Federal supervision over the property and members" of the tribe, and that it contained absolutely no mention of hunting

and fishing rights. 391 U.S. at 408, 88 S.Ct. at 1708. Under such circumstances, the Court found "it difficult to believe that Congress, without explicit statement, would" subject the United States to a claim for compensation "by destroying property rights conferred by treaty". *Id.* at 413, 88 S.Ct. at 1711. The Court also found its conclusion buttressed by specific legislative history.

Similarly, in *State of Washington, supra,* the statute at issue would have infringed substantially on Indian rights even though the purpose of the statute in no way necessitated any such infringement. In *State of Washington,* the United States and Canada agreed in a treaty that American and Canadian fishermen would divide equally the catch of Fraser River salmon. The State of Washington argued that this treaty extinguished what were long-standing Indian fishing rights. The Supreme Court affirmed a ruling by this court that the treaty did not alter the proportion of the American share of the salmon that the Indians could legally take.

This case does not involve the termination or diminishment of a reservation, or the total extinguishment of hunting and fishing rights, as in *Menominee, supra,* or even a substantial infringement on fishing and hunting rights, as in *State of Washington, supra.* Rather it involves a relatively insignificant modification of the Indian's hunting rights. There is no evidence that the bald eagle historically provided the Indian with any commercial benefit or had any subsistence value. The only apparent reason to hunt eagles is for religious and ceremonial purposes. Presumably to correct an oversight in the original Act, Congress amended § 668a, *supra,* in 1962 to permit the use of eagle specimens for religious purposes. While the amendment did not expressly refer to treaty rights, it is clear that Congress intended the Act to apply to Indians. There was less reason to state expressly that treaty rights were modified than in those cases where substantial infringements were involved.

We agree with Judge Lay that the majority's analysis in *White* is too narrow and overlooked the "broad wording and the pervasive purpose which the Act is intended to fulfill—the protection of the bald and golden eagles". We are persuaded that the "surrounding circumstances" establish a congressional determination to modify or abrogate the treaty to the extent of prohibiting the taking, shooting, and killing of bald eagles.

The purpose of the Eagle Protection Act is an important circumstance to be considered in determining congressional intent. The Supreme Court has long recognized that reasonable and non-discriminatory conservation statutes implicitly affect treaty rights to the extent necessary to achieve their conservation purpose. In *Kennedy v. Becker,* 241 U.S. 556, 36 S.Ct. 705, 60 L.Ed.2d 1166 (1916), the Court held that Indians having a treaty privilege to fish in waters under New York State jurisdiction were subject to state regulations designed to achieve a conservation purpose. The Court reasoned:

> It is said that the state would regulate the whites and that the Indian tribe would regulate its members, but if neither could exercise authority with respect to the other at the *locus in quo,* either would be free to destroy the subject of the power. Such a duality of sovereignty instead of maintaining in each the essential power of preservation would in fact deny it to both.

*Id.* at 563, 36 S.Ct. at 707.[8] See also *United States v. Winans,* 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905).

More recently the Supreme Court has addressed the relationship between state conservation statutes and Indian treaty rights in a series of cases between the Puyallup Indian Tribe and the State of Washington. In *Puyallup Tribe v. Wash. Dept. of Game,* 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968) (*Puyallup I*), the Court recognized that a treaty fishing right cannot be quali-

---

8. In *White, supra,* Judge Lay cited *Becker* as authority for the proposition that "a conserva-

tion statute will achieve its purpose only if it applies to everyone." 508 F.2d at 461.

fied by a state, but held that it "may be regulated by the State in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indians". *Id.* at 398, 88 S.Ct. at 1728.[9] *Washington Dept. of Game v. Puyallup Tribe*, 414 U.S. 44, 94 S.Ct. 330, 38 L.Ed.2d 254 (1973) (*Puyallup II*), involved the question of whether the State could ban all Indian netting of steelhead in the interest of conserving the species. The Court found the ban impermissible because it discriminated against the Indians; it barred all Indian net fishing and allowed only hook-and-line fishing entirely preempted by non-Indians. The Court noted, however, that the aim of conservation statutes as they apply to Indians is "to accommodate the rights of Indians under the Treaty and the rights of other people". *Id.* at 49, 94 S.Ct. at 333. Pertinent to this case the Court stated:

> We do not imply that these fishing rights persist down to the very last steelhead in the river. Rights can be controlled by the need to conserve a species; and the time may come when the life of a steelhead is so precarious in a particular stream that all fishing should be banned until the species regains assurance of survival. The police power of the State is adequate to prevent the steelhead from following the fate of the passenger pigeon; and the Treaty does not give the Indians a federal right to pursue the last living steelhead until it enters their nets.

*Id.* at 49, 94 S.Ct. at 333–334.

■ These cases indicate that reasonable conservation statutes affect Indian treaty rights when (1) the sovereign exercising its police power to conserve a resource has jurisdiction in the area where the activity occurs; (2) the statute applies in a non-dis-

criminatory manner to both treaty and non-treaty persons; and (3) the application of the statute to treaty rights is necessary to achieve its conservation purpose. A total ban of all treaty taking is allowable when necessary to assure the survival of the species. The Eagle Protection Act satisfies these criteria. It applies "within the United States or any place subject to the jurisdiction thereof," and as such, it is applicable on Indian reservations. It is non-discriminatory since all conceivable threats to the bald eagle's survival, whether by treaty or non-treaty persons, are banned by the sweeping language used to describe the prohibited acts. Finally, the avowed purpose of the Act is to prevent the extinction of the bald eagle, the emblem of the nation, rather than merely to conserve a resource. The life of the bald eagle has become so precarious that all threats, including takings pursuant to Indian treaty, should be banned to assure the species' survival.

That Congress intended to ban all threats to the bald eagle's survival is clear from the legislative histories and preambles accompanying the original act and its two amendments. The preamble to the original act states that "the bald eagle is no longer a mere bird of biological interest but a symbol of the American ideals of freedom; and . . . is now threatened with extinction. . . ." June 8, 1940 c. 278 § 1, 54 Stat. 250. A letter from the Acting Secretary of Agriculture, made part of both the House and Senate Report on the original act, states: "It is . . . apparent that if destruction of the eagle and its eggs continue as in the past this bird will wholly disappear from much the larger part of its former range and eventually will become extinct." H.R.Rep.No.2104, 76 Cong., 3d Sess. 1 (1940).[10]

9. "The 'appropriate standards' requirement means that the State must demonstrate that its regulation is a reasonable and necessary conservation measure." The rule applies to Indian hunting rights as well as fishing rights. *Antoine v. Washington*, 420 U.S. 194, 207, 95 S.Ct. 944, 952, 43 L.Ed.2d 129 (1974).

10. It is clear also that the ban was not limited to killing bald eagles for commercial purposes.

The letter from the Secretary noted that it "is apparent to this Department from its long observations with respect to the wildlife of this country that there are those in any community in which an eagle may appear who are immediately seized with the determination to kill it for no other reason than it is an eagle and a bird of large proportions."

As reflected in the preamble to the 1962 amendment, even incidental dangers were to be eliminated. The amendment extended protection to the golden eagle partially to afford greater protection to the bald eagle which is often killed by persons mistaking it for the golden eagle. 1962 U.S. Code Cong. & Admin.News, p. 1453.[11]

In 1972 Congress was presented with evidence that the Act had not totally deterred the senseless destruction and possible extinction of the bald and golden eagles. It responded by increasing the permissible punishment from a possible $500 fine to a $15,000 fine and increasing the possible prison sentence from six months to one year. Again the need for comprehensive legislation can be found in legislative history. A letter from the Assistant Secretary of the Interior to Senator Magnuson, Chairman of the Committee on Commerce, reads:

> There exists but 10–20,000 golden eagles; and 20–30,000 northern bald eagles. The prompt enactment of H.R. 12186 will help to protect these majestic birds, aptly described by the Congress in 1940 as "a symbol of the American ideals of freedom".

This continued congressional tightening of the Act to avoid extinction of the bald eagle is a further indication that Congress intended to prohibit all threats to the bald eagle without regard to the existence of treaty hunting rights.

Congressional intent to ban all conceivable threats to the bald eagle's existence, including those posed by treaty Indians, is also reflected in the comprehensive structure of the Act. As the Court noted in *Andrus v. Allard, supra,* the "broad proscriptive provisions of the Eagle Act were consistently framed to encompass a full catalog of prohibited acts . . . ." 100 S.Ct. at 322. § 668(a) makes it punishable for any person within any place subject to the jurisdiction of the United States to "take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport, export or import, *at anytime* or *in any manner,* any bald eagle . . . or any golden eagle, alive or dead . . . ." (Emphasis added). The Court in *Andrus v. Allard* noted further: "In contrast, the exemptions created were specifically limited. . . ."[12] *Id.* 100 S.Ct. at 322. Pursuant to § 668a permits may only be granted if after an investigation, the Secretary of the Interior determines the use is "compatible with the preservation of the bald eagle . . . ." Under the 1962 amendment Congress provided an exemption for the only legitimate purpose for hunting eagles by treaty Indians—the "religious purposes of Indian tribes". The district court found that Fryberg did not kill the eagle for religious purposes. It is admitted that he did not have a permit.

Even though there was no express statement on the "face of the Act" or in the legislative history that Congress intended to abrogate or modify Indian treaty hunting rights, we are convinced that it is clear from the "surrounding circumstances" and "legislative history", including the broad purpose of the Act to protect the bald eagle and prevent its extinction, that Congress intended to modify Indian treaty rights to prohibit the taking of bald eagles, in the absence of a permit pursuant to § 668a.

AFFIRMED.

---

11. The preamble to the 1962 amendment states in part: [P]rotection of the golden eagle will afford greater protection for the bald eagle, the national symbol of the United States of America because the bald eagle is often killed by persons mistaking it for the golden eagle . . . .

12. The Court said further: "That this precise use of terminology was intentional *is* clear from the legislative history."