GOULD, Circuit Judge,
with whom HILL and BERZON, Circuit Judges, concur.
In addition to arguing their NEPA claim, plaintiffs maintain that the federal defendants issued a gray whale quota to the Tribe in violation of the Marine Mammal Protection Act (MMPA), 16 U.S.C. § 1361 et seq., which prohibits the taking of marine mammals absent a permit or waiver. The Tribe has not applied for a permit or waiver under the MMPA. Defendants maintain that the MMPA does not apply because the Tribe’s whaling quota has been expressly provided for by an international treaty, or, in the alternative, because the Tribe has an Indian treaty whaling right that is not affected by the MMPA.
A. Exemption
The federal defendants, including NOAA, and the Makah Tribe as defendant-intervenor first assert that § 1372(a)(2) of the MMPA exempts the Tribe’s whaling from the MMPA moratorium. Section 1372(a)(2) provides an exception to the MMPA’s blanket moratorium on the taking of marine mammals when takes have been “expressly provided for by an international treaty, convention, or agreement to which the United States is a party and which was entered into before [1972] or by any statute implementing any such treaty, convention, or agreement.” 16 U.S.C. § 1372(a)(2). Defendants argue that § 1372(a)(2) applies here because the International Whaling Commission (IWC) approved a gray whale quota for the Tribe in 1997. We reject this argument for several reasons.
First, there is the problem of timing. Defendants recognize that a 1997 approval does not pre-date the MMPA as required by § 1372(a)(2), but argue that the 1997 approval relates back to the International Convention for the Regulation of Whaling (ICRW), which the United States signed in 1946. The ICRW enacted a schedule of whaling regulations (Schedule) and granted the IWC the power to amend the Schedule by adopting subsequent regulations, including quotas. International Convention for the Regulation of Whaling, 62 Stat. 1716, 1717-19 (1946). Defendants argue that, because the IWC was given the power to adopt quotas in 1946, the Tribe’s quota approved in 1997 should be considered a right under the 1946 Convention that pre-dates the MMPA.
We disagree. The 1997 Schedule was adopted more than twenty-four years' after *786 the MMPA became effective. Section 1372(a)(2) exempts only international treaties that pre-date the MMPA, without also exempting amendments to those treaties. If Congress wanted to exempt subsequent amendments, then Congress could have done so explicitly. But Congress did not do so. That Congress did not intend to exempt subsequent amendments is clear when § 1372(a)(2) is considered alongside the mandates of § 1378(a)(4). Section 1378(a)(4) requires “the amendment of any existing international treaty for the protection and conservation of any species of marine mammal to which the United States is a party in order to make such treaty consistent with the purposes and policies of this [Act].” 16 U.S.C. § 1378(a)(4). Far from intending amendments of international treaties to escape the restrictions of the MMPA moratorium by relating back to the treaties’ pre-MMPA inception, Congress mandated that existing treaties be amended to incorporate the conservation principles of MMPA. It would be incongruous to interpret § 1372(a)(2) to exempt the amendments that were mandated by § 1378(a)(4). And, if we accepted the defendants’ view, then we would read the MMPA to disregard its conservation principles whenever in the future the IWC made unknown decisions for unknown reasons about the killing of unknown numbers of whales. We do not believe that Congress subordinated its goal of conservation in United States waters to the decisions of unknown future foreign delegates to an international commission.
Second, there is a problem of specificity. Even if we were to read the 1997 Schedule to relate back to the 1946 Convention and thus to pre-date the MMPA, § 1372(a)(2) still would not apply here because the Schedule fails expressly to provide any whaling quota for the Tribe.[18] Defendants do not dispute that the Schedule fails to mention the Tribe on its face. But defendants argue that IWC Schedules in practice never mention particular aboriginal tribes, but rather provide general quotas based on specific needs of particular tribes.[19] Whatever may be the IWC’s practice, the MMPA unambiguously requires express approval for § 1372(a)(2) to apply and to excuse the takings of marine mammals without a permit.
Third, there is a problem of uncertainty. We cannot tell whether the IWC intended a quota specifically to benefit the Tribe. Even if timing and specificity were no problem, the surrounding circumstances of the adoption of the Schedule cast doubt on the intent of the IWC to approve a quota for the Tribe. The Schedule extends the quota only to those aborigines whose “subsistence and cultural needs have been re-cognised.” This language was inserted into the Schedule after some IWC delegates questioned whether the Tribe quali *787 fied for the aboriginal subsistence quota. See Metcalf v. Daley, 214 F.3d 1135, 1140 (9th Cir.2000). Whether recognition must formally come from the IWC or from the United States is not clear.
In light of the circumstances giving rise to this language, the IWC presumably intended that such recognition, whether it came from the IWC or the United States, would depend on the Tribe’s ability to satisfy the definition of aboriginal subsistence whaling. When the United States presented its request for a quota for the Makah Tribe to the IWC, the United States, in response to issues raised by the IWC during subcommittee, represented that the IWC had adopted the following definition of aboriginal subsistence whaling:
whaling, for purposes of local aboriginal consumption carried out by or on behalf of aboriginal, indigenous, or native peoples who share strong community, familial, social, and cultural ties related to a continuing traditional dependence on whaling and on the use of whales,
(emphasis added).[20] While NOAA issued a Federal Register Notice in April 1998 recognizing the Tribe’s subsistence and cultural needs, Notice of Aboriginal Subsistence Whaling Quotas, 63 Fed.Reg. 16,-701 (1998), it is not clear that the IWC anticipated such recognition, given that the United States relied on a definition of subsistence whaling that requires a “continuing traditional dependence” on whaling and given that the Tribe had not engaged in whaling since 1927.
Because the IWC adopted the “has been recognised” language in response to opposition to the Tribe’s whaling, and because it was not a foregone conclusion that the Tribe would satisfy the definition of aboriginal subsistence whaling, the IWC’s intent to approve a whaling quota for the Tribe has not been demonstrated. The “expressly provided for” requirement of § 1372(a)(2) is not satisfied.
Fourth, § 1372(a)(2) does not apply in this case by way of a statute implementing an international treaty because there is no domestic statute implementing the ICRW that expressly permits the Tribe’s whaling. The Whaling Convention Act (WCA), 16 U.S.C. § 916, implements the ICRW domestically, making it unlawful to take whales without first obtaining a quota from the IWC. 16 U.S.C. § 916c. The WCA does not mention quotas or aboriginal subsistence whaling, much less the Tribe’s whaling, and therefore is of no assistance to defendants.
In sum, the defendants’ rebanee on § 1372(a)(2) to exempt the Tribe’s whaling from the MMPA’s general moratorium is misplaced. The federal defendants’ view so clearly offends the express, unambiguous language of the statute that the statutory interpretation offered by NOAA and the federal defendants cannot properly be afforded deference under Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).
B. Conservation Necessity
We consider whether the MMPA must apply to the Tribe to effectuate the conservation purpose of the statute.[21] In *788 Fryberg, we set out a three-part test for determining when reasonable conservation statutes affect Indian treaty rights: (1) the sovereign has jurisdiction in the area where the activity occurs; (2) the statute is non-discriminatory; and (3) the application of the statute to treaty rights is necessary to achieve its conservation purpose. 622 F.2d at 1015.[22] Applying this rule, the MMPA may regulate any pre-existing Ma-kah Tribe whaling rights under treaty if (1) the United States has jurisdiction where the whaling occurs; (2) the MMPA applies in a non-discriminatory manner to treaty and non-treaty persons alike; and (3) the application of the statute to regulate treaty rights is necessary to achieve its conservation purpose. See id.
As to the first prong of the test, the MMPA extends to “any person subject to the jurisdiction of the United States,” 16 U.S.C. § 1372(a)(1), and reaches 200 nautical miles outward from the seaward boundary of each coastal state, 16 U.S.C. § 1362(15). Thus, the MMPA would clearly apply to the Tribe’s whaling off the coast of Washington State in the Strait of Juan de Fuca. As to the second prong, the MMPA places a general moratorium on all persons except certain Native Alaskans with subsistence needs. The MMPA cannot be said to discriminate between treaty and non-treaty persons because members of the Tribe are not being singled out any more than non-treaty people in the lower forty-eight states.
*789 The third prong of the Fryberg test requires that the application of the MMPA to the Tribe be necessary to achieve its conservation purpose. This prong frames for us the critical issue under this test: whether restraint on the Tribe’s whaling pursuant to treaty rights is necessary to effectuate the conservation purpose of the MMPA. In assessing this issue, we are mindful that the major objective of the MMPA is to ensure that marine mammals continue to be “significant functioning element[s] in the ecosystem.” 16 U.S.C. § 1361(2). In fact, “[marine mammals] should not be permitted to diminish below their optimum sustainable population.” Id. To carry out these conservation objectives, the MMPA implements a sweeping moratorium in combination with a permitting process to ensure that the taking of marine mammals is specifically authorized and systematically reviewed. For example, the MMPA requires that the administering agency consider “distribution, abundance, breeding habits, and times and lines of migratory movements of such marine mammals” when deciding the appropriateness of waiving requirements under the MMPA, 16 U.S.C. § 1371(a)(3)(A). And, when certain permits are issued, the permit may be suspended if the taking results in “more than a negligible impact on the species or stock concerned.” 16 U.S.C. § 1371(a)(5)(B)(ii). One need only review Congress’s carefully selected language to realize that Congress’s concern was not merely with survival of marine mammals, though that is of inestimable importance, but more broadly with ensuring that these mammals maintain an “optimum sustainable population” and remain “significant functioning elements in the ecosystem.” The MMPA’s requirements for taking are specifically designed to promote such objectives. Without subjecting the Tribe’s whaling to review under the MMPA, there is no assurance that the takes by the Tribe of gray whales, including both those killed and those harassed without success, will not threaten the role of the gray whales as functioning elements of the marine ecosystem, and thus no assurance that the purpose of the MMPA will be effectuated.[23]
If the Tribe’s plans for whaling could proceed without regulation, we cannot be certain that future whaling by the Tribe will not jeopardize the gray whale population either through its current plan or through future expanded quotas. While the Tribe’s current Gray Whale Management Plan allows the Tribe to hunt whales with rifles and motorized boats, the Tribe is not limited to a particular method of hunting by the terms of the Treaty of Neah Bay. See United States v. Washington, 384 F.Supp. 312, 407 (WD.Wash.1974) (commonly referred to as the “Boldt” decision), aff'd, 520 F.2d 676 (9th Cir.1975), cert. denied, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976) (“Just as non-Indians may continue to take advantage of improvements in fishing techniques, the Treaty Tribes may, in exercising their rights to take anadromous fish, utilize improvements in traditional fishing methods, such for example as nylon nets and steel hooks.”). The Tribe, therefore, could use evolving technology to facilitate more efficient hunting of the gray whales. The tribal council of the Makah Tribe has *790 shown admirable restraint in limiting its aim to a small number of whales, and seeking the umbrella approval of the United States for a share of a quota approved by the IWC. But it is not clear the extent to which the Tribe’s treaty right is limited to the approvals of the IWC or the Tribe’s Gray Whale Management Plan. The intent of Congress cannot be hostage to the goodwill or good judgment or good sense of the particular leaders empowered by the Tribe at present; it must be assumed that Congress intended to effectuate policies for the United States and its residents, including the Makah Tribe, that transcend the decisions of any subordinate group.
If the MMPA’s conservation purpose were forced to yield to the Makah Tribe’s treaty rights, other tribes could also claim the right to hunt marine mammals without complying with the MMPA. While defendants argue that the Makah Tribe is the only tribe in the United States with a treaty right expressly guaranteeing the right to whale, that argument ignores the fact that whale hunting could be protected under less specific treaty language. The EA prepared by the federal defendants notes that other Pacific Coast tribes that once hunted whales have reserved traditional “hunting and fishing” rights in their treaties. These less specific “hunting and fishing” rights might be urged to cover a hunt for marine mammals. Although such mammals might not be the subject of “fishing,” there is little doubt they are “hunted.”
Defendants argue that the conservation necessity test under Fryberg is not triggered until species preservation emerges as an issue. We have rejected the idea that species preservation must be an issue for the conservation necessity principle to apply. Eberhardt, 789 F.2d at 1362, citing United States v. Oregon, 718 F.2d 299, 305 (9th Cir.1983). Satisfaction of the Fryberg test depends on the conservation purpose of the statute. Here the purpose of the MMPA is not limited to species preservation. Whether the Tribe’s whaling will damage the delicate balance of the gray whales in the marine ecosystem is a question that must be asked long before we reach the desperate point where we face a reactive scramble for species preservation. To effectuate the purpose of the MMPA, which is to make informed, proactive decisions regarding the effect of marine mammal takes, we conclude that the MMPA must apply to the Tribe, even if its treaty rights must be considered and given weight by NMFS in implementing the MMPA, an issue we do not decide.[24]
The application of the MMPA to the Tribe to uphold the conservation purpose of the MMPA goes hand in hand with the principles embedded in the Treaty of Neah Bay itself. The treaty language, when considered on its face, supports our conclusion that the conservation purpose of the MMPA requires it be applied to the Tribe. The Treaty of Neah Bay provides the Tribe with a right to fish and hunt whales “in common with all citizens of the United States.” 12 Stat. 939, 940 (1855). We have recognized that the “in common with” language creates a relationship between Indians and non-Indians similar to a cotenancy, in which neither party may “permit the subject matter of [the treaty] to be destroyed.” United States v. Washington, 520 F.2d 676, 685 (9th Cir.1975). See also United States v. Washington, 761 F.2d 1404, 1408 (9th Cir.1985) (recognizing *791 that “in common with” has been interpreted to give rise to cotenancy type relationship). While this “in common with” clause does not strip Indians of the substance of their treaty rights, see Washington v. Washington Commercial Passenger Fishing Vessel Ass’n, 443 U.S. 658, 677 n. 22, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979), it does prevent Indians from relying on treaty rights to deprive other citizens of a fan’ apportionment of a resource. See id. at 683-84, 99 S.Ct. 3055. In Washington Commercial Passenger Fishing Vessel Ass’n, the Supreme Court concluded that: “Nontreaty fishermen may not rely on property law concepts, devices such as the fish wheel, license fees, or general regulations to deprive the Indians of a fair share of the relevant runs of anadromous fish in the case area. Nor may the treaty fishermen rely on their exclusive right of access to the reservations to destroy the rights of other ‘citizens of the Territory.’ Both sides have a right, secured by the treaty, to take a fair share of the available fish. That, we think, is what the parties to the treaty intended when they secured to the Indians a right of taking fish in common with other citizens.” Id. at 684-85, 99 S.Ct. 3055. This holding might be read to suggest that the Tribe’s treaty right gives the Tribe a right to a “fair share” of whales that are to be taken. The “fair share” formula, however, does not provide a ready answer in this case, which involves now-protected marine mammals rather than salmon and other fish available, within limits, for fishing. The question presented to us is not how whaling rights can be fairly apportioned between Indians and non-Indians. Rather, the Tribe asserts a treaty right that would give the Tribe the exclusive ability to hunt whales free from the regulatory scheme of the MMPA. Just as treaty fisherman are not permitted to “totally frustrate ... the rights of the non-Indian citizens of Washington” to fish, Puyallup Tribe v. Dept. of Game of Wash., 433 U.S. 165, 175, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977) (Puyall-up II), the Makah cannot, consistent with the plain terms of the treaty, hunt whales without regard to processes in place and designed to advance conservation values by preserving marine mammals or to engage in whalewatching, scientific study, and other non-consumptive uses. See Wash. v. Wash. Commercial Passenger Fishing Vessel, 443 U.S. at 658, 99 S.Ct. 3055. The Supreme Court has recognized that regulation for the purpose of conservation is permissible despite the existence of treaty rights. Washington Commercial Passenger Fishing Vessel Ass’n, 443 U.S. at 682, 99 S.Ct. 3055 (“Although nontreaty fishermen might be subjected to any reasonable state fishing regulation serving any legitimate purpose, treaty fishermen are immune from all regulation save that required for conservation.”) (emphasis added). Mindful of that recognition, we conclude that to the extent there is a “fair share” of marine mammal takes by the Tribe, the proper scope of such a share must be considered in light of the MMPA through its permit or waiver- process. The MMPA will properly allow the taking of marine mammals only when it will not diminish the sustainability and optimum level of the resource for all citizens. The procedural safeguards and conservation principles of the MMPA ensure that marine mammals like the gray whale can be sustained as a resource for the benefit of the Tribe and others.
Having concluded that the MMPA is applicable to regulate any whaling proposed by the Tribe because the MMPA’s application is necessary to effectuate the conservation purpose of the statute, and because such application is consistent with the language of the Neah Bay Treaty, we conclude that the issuance by NOAA of a *792 gray whale quota to the Tribe, absent compliance with the MMPA, violates federal law. Whether or not the Tribe may have sufficient justification to gain a permit or waiver allowing whaling under the MMPA, we must now set aside NOAA’s approval of the Tribe’s whaling quota absent MMPA compliance as “arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.” 5 U.S.C. § 706(2)(A).[25]
Of course, in holding that the MMPA applies to the Tribe, we need not and do not decide whether the Tribe’s whaling rights have been abrogated by the MMPA.[26] We simply hold that the Tribe, to pursue any treaty rights for whaling, must comply with the process prescribed in the MMPA for authorizing a “take” because it is the procedure that ensures the Tribe’s whaling will not frustrate the conservation goals of the MMPA.
IV. Conclusion
We hold that the federal defendants did not satisfy NEPA when they issued a finding of no significant impact as a result of an environmental assessment: For the reasons set forth above in section II, it is necessary that the federal actions be reviewed in an environmental impact statement. Also, we hold that both the federal defendants and the Tribe did not satisfy the permit or waiver requirements of the MMPA, and, for the reasons set forth above in section III, they must do so before any taking of a marine mammal.
REVERSED.
*793 APPENDIX
[[Image here]]

. The Schedule provides for:
The taking of gray whales from the Eastern stock in the North Pacific is permitted, but only by aborigines or a Contracting Government on behalf of aborigines, and then only when the meat and products of such whales are to be used exclusively for local consumption by the aborigines whose traditional aboriginal subsistence and cultural needs have been recognised.... For the years 1998, 1999, 2000, 2001, and 2002, the number of gray whales taken in accordance with this sub-paragraph shall not exceed 620, provided that the number of gray whales taken in any one of the years 1998, 1999, 2000, 2001, or 2002 shall not exceed 140.

. The 1997 Schedule, for example, approves the taking of 620 gray whales over five years from the Eastern stock in the North Pacific. Defendants contend that this quota is meant to accommodate the subsistence needs of the Tribe as well as Russian Chukotka aborigines over the five-year period.

. It is unclear whether the IWC has in fact definitively adopted a definition of aboriginal subsistence whaling. See supra footnote 7.

. The conservation necessity principle finds its roots in the state context, allowing state regulation of Indian treaty rights even though states do not otherwise possess Congress's authority to qualify treaty rights. Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172, 205, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999). See also Antoine v. Washington, 420 U.S. 194, 95 S.Ct. 944, 43 L.Ed.2d 129, *788 (1975) (tribal hunting and fishing rights may be restricted by a regulation that is a "reasonable and necessary conservation measure”) (citations omitted); Puyallup Tribe v. Dept. of Game (Puyallup I), 391 U.S. 392, 398, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968) (states may regulate tribal hunting and fishing rights if the regulation meets "appropriate standards” and is non-discriminatory). The invocation of the conservation necessity principle, however, is not limited to state regulation. See United. States v. Fryberg, 622 F.2d 1010, 1014-1015 (9th Cir.1980). See also United States v. Eberhardt, 789 F.2d 1354, 1360 (9th Cir.1986) (making it clear that the Department of Interi- or has the authority to enact regulations to manage and conserve Indian resources). Indeed, because the states do not have the power held by Congress to regulate affairs with Indian nations, state regulation of treaty hunting or fishing rights may be more limited in scope than federal regulation. See Eberhardt, 789 F.2d at 1362. We express no opinion as to whether and, if so, the extent to which our decision has relevance to assessment of state conservation regulation that touches on treaty rights.

. Fryberg addressed whether the Eagle Protection Act, 16 U.S.C. § 668 et seq., abrogated treaty hunting rights by prohibiting the taking and killing of bald eagles. 622 F.2d at 1011. Though the ultimate issue in Fryberg was abrogation, Fryberg also articulated a test for identifying conservation statutes that affect treaty rights. Id. at 1015. That test was based on Supreme Court authority that allows conservation statutes to affect treaty rights to the extent necessary to achieve their conservation purpose. Id. at 1014-15. The Supreme Court authority relied on by Fryberg remains good law. See Antoine v. Washington, 420 U.S. 194, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975); Wash. Dep’t of Game v. Puyallup Tribe, 414 U.S. 44, 94 S.Ct. 330, 38 L.Ed.2d 254 (1973) (Puyallup II); Puyallup Tribe v. Wash. Dep't of Game, 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968) (Puyallup I); Kennedy v. Becker, 241 U.S. 556, 36 S.Ct. 705, 60 L.Ed. 1166 (1916). Moreover, Fryberg did not purport to substitute the conservation necessity test for an abrogation analysis. Rather, Ftyberg used the conservation purpose of the statute to bolster its conclusion that Congress clearly intended to abrogate treaty rights by enacting the Eagle Protection Act. Later, the same conclusion was reached by the Supreme Court in United States v. Dion, 476 U.S. 734, 106 S.Ct. 2216, 90 L.Ed.2d 767 (1986), though the Supreme Court did not discuss the conservation necessity principle. Still, regardless of Fryberg’s posture as an abrogation case, we conclude that the conservation necessity test articulated by Fryberg has not been undermined by later cases and is supported by the Supreme Court authorities above cited.

. While we conclude here that the Tribe must undergo the MMPA permitting process to ensure the conservation goals of the Act are effectuated, we do not purport to address what limitations on the scope of a permit, if any is issued, would be appropriate to achieve the conservation purpose of the Act. Any disputes arising under the MMPA’s terms regarding whether, and the means by which, any whaling may be carried out will emerge clearly and concretely in the permitting process, and can be resolved at that juncture by the responsible agencies or on judicial review thereafter.

. This conclusion is reinforced by our holding in Midwater Trawlers Co-operative v. Dep’t of Commerce, 282 F.3d 710 (9th Cir.2002), wherein we held that the Magnuson-Stevens Act, which has as its purpose the protection of U.S. fisheries, applies to the Makah’s fishing rights despite the Treaty of Neah Bay.

. In Metcalf, we concluded that NOAA violated NEPA because agencies must engage the NEPA process "before any irreversible and irretrievable commitment of resources.” 214 F.3d at 1143 (citations omitted). Therefore, before NOAA can issue the Tribe a permit or waiver under the MMPA, which would be an "irretrievable commitment of resources,” NOAA must complete the NEPA process. Otherwise, NOAA may have granted permits for takings of marine mammals without first fully considering the effects of that federal action through NEPA.

. Having determined that the procedures of the MMPA apply to the Tribe, in light of the conservation principle and the ‘in common with’ language of the treaty, we need not resolve the abrogation issue presented by the plaintiffs: The NMFS might authorize prescribed whaling to proceed under the MMPA, albeit with conditions designed to ensure the perpetuation of the resident whale population. Unlike other persons applying for a permit or waiver under the MMPA, the Tribe may urge a treaty right to be considered in the NMFS’s review of an application submitted by the Tribe under the MMPA.